# Illinois Official Reports

## Appellate Court

---

**Wade v. Stewart Title Guaranty Co., 2017 IL App (1st) 161765**

---

| | |
|---|---|
| Appellate Court Caption | JOSEPHINE WADE, Plaintiff-Appellant, v. STEWART TITLE GUARANTY COMPANY, Defendant-Appellee. |
| District & No. | First District, Fifth Division<br>Docket No. 1-16-1765 |
| Filed | June 30, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-14015; the Hon. James E. Snyder, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | David A. Epstein, of D.A.E. Law Office, of Chicago, and Gary A. Weintraub, of Gary A. Weintraub, P.C., of Northfield, for appellant.<br><br>John D. Burke and Nicholas A. Castro, of Ice Miller LLP, of Chicago, for appellee. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Hall and Lampkin concurred in the judgment and opinion. |

**OPINION**

¶ 1  The instant appeal arises from a breach of contract dispute regarding a title insurance policy for a multi-unit residential building in Chicago, Illinois. Plaintiff, Josephine Wade, the purchaser of the property, filed suit against defendant, Stewart Title Guaranty Company, alleging that defendant failed to timely remove defects on the property's title. Plaintiff claimed that defendant's delay in curing the title defects resulted in the demolition of the property because plaintiff was unable to obtain a loan to rehabilitate the property to comply with the City of Chicago's building code. Following a bench trial, the trial court found in favor of defendant, finding that defendant did not breach any duties it owed to plaintiff under the policy. Plaintiff appeals the judgment entered by the trial court. We affirm.

¶ 2  BACKGROUND

¶ 3  I. Complaint

¶ 4  On December 11, 2013, plaintiff filed a two-count complaint[1] against defendant, alleging that plaintiff purchased a title insurance policy from defendant on December 6, 2006, in conjunction with plaintiff's purchase of a two-unit, residential property located on Washington Street in Chicago (Washington property). Under the terms of the policy, defendant agreed to provide plaintiff title insurance in the amount of $187,200 against any loss or damages resulting from any defects on the title to the Washington property. The complaint alleges that defendant represented in the policy that the only defects on the title were the mortgage plaintiff had secured to purchase the Washington property and unpaid real estate taxes from 2005 and 2006. Relying on these representations in the policy, plaintiff closed on the property on November 21, 2006.[2]

¶ 5  The complaint alleged that subsequent to the closing, plaintiff learned of two additional defects to the title of the property. First, she learned that on September 29, 2006, the City of Chicago had instituted a housing court action due to building code violations on the property and had recorded a *lis pendens* on the property. Additionally, she learned that on October 3, 2007, Deutsche Bank had filed a foreclosure action on the Washington property due to the seller's default on a second mortgage dated May 23, 2003, that had been unknown to plaintiff.[3] The complaint alleges that defendant eventually paid off the second mortgage to Deutsche Bank under the policy in order to remove the Washington property's title defects. However, the complaint alleges that the unpaid second mortgage on the title prevented plaintiff from obtaining a loan to finance required repairs to the property. Due to plaintiff's inability to finance the repairs, the complaint alleges that the progression of the housing court action resulted in a demolition order entered on July 2, 2012, against the Washington property. The

---

[1]An amended complaint was filed on February 4, 2014, correcting defendant's name to "Stewart Title Guaranty Company."

[2]We note that defendant did not issue its title policy until December 6, 2006, after the closing. However, defendant had issued a title commitment on November 7, 2006, prior to the November 21, 2006, closing. It is presumably this title commitment that plaintiff allegedly relied on, rather than the subsequently issued title policy.

[3]The seller was plaintiff's son.

complaint alleges that plaintiff would not have closed on the Washington property had she been aware of the two defects against the title of the property.

¶ 6 The complaint set forth two counts. Count I was for breach of contract and alleged that defendant "breached its obligations under the Policy by failing to reimburse plaintiff for her direct losses in the value of the Property and the cost of its demolition due to the undisclosed, existing and insured (a) Deutsche Bank lien and (b) Housing Court Action." Plaintiff alleged she fully performed her premium payment obligations. Plaintiff alleged she suffered damages as a result of defendant's breach of the policy in excess of $100,000.

¶ 7 Count II was for a violation under section 155 of the Illinois Insurance Code (Insurance Code) (215 ILCS 5/155 (West 2012)). Plaintiff alleged that despite multiple requests to pay the amounts owed to Deutsche Bank and the housing court action under the policy to remove the title defects, defendant refused to pay and, instead, pursued litigation. The complaint alleged that "defendant has acted vexatiously and unreasonably" and had acted in bad faith in violation of the Insurance Code.

¶ 8 Attached to the complaint was the title insurance policy issued to plaintiff, dated December 6, 2006. Under the policy, defendant agreed to insure plaintiff against "loss or damage, not exceeding the Amount of Insurance stated in Schedule A, sustained or incurred by the Insured by reason of any defect in or lien or encumbrance on the title." The policy excluded from coverage "defects, liens, encumbrances, adverse claims or other matters created, suffered, assumed or agreed to by the insured claimant."

¶ 9 Section 3 of the policy was titled "Notice of Claim to be given by Insured Claimant" and provided, in relevant part:

"The insured shall notify the Company promptly in writing[4]: *** (ii) in case knowledge shall come to an insured hereunder of any claim of title or interest which is adverse to the title to the estate or interest, as insured, and which might cause loss or damage for which the Company may be liable by virtue of this policy."

Section 17 of the policy provided that "all notices required to be given to the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company at P.O. Box 2029, Houston, Texas, 77252-2029."

¶ 10 Section 4 was titled "Defense and Prosecution of Actions; Duty of Insured Claimant to Cooperate" and provided, in relevant part:

"Upon written request by the insured and subject to the options contained in Section 6 of these Conditions and Stipulations, the Company, at its own cost and without unreasonable delay, shall provide for the defense of an insured in litigation in which any third party asserts a claim adverse to the title or interest as insured, but only as to those stated causes of action alleging a defect, lien or encumbrance or other matter insured against by this policy."

¶ 11 Section 4 further stated: "The Company shall have the right, at its own costs, to institute and prosecute any action or proceeding or to do any other act which in its option may be

---

[4]Plaintiff argued in oral arguments that the policy did not contain a provision for written notification.

necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the Insured."

¶ 12 Section 6, which was titled "Options to Pay Or Otherwise Settle Claims; Termination of Liability," provided additional options for defendant in the event a claim under the policy arose. Specifically, section 6(a) provided the option:

"To pay or tender payment of the amount of Insurance under this policy together with any costs, attorneys fees and expenses incurred by the insured claimant, which were authorized by the company up to the time of payment or tender of payment and which the Company is obligated to pay."

¶ 13 Section 6(b) provided defendant the option to pay or otherwise settle with parties other than the insured. Section 6(b) allowed defendant to:

"(i) pay or otherwise settle with other parties for or in the name of an insured claimant any claim Insured against, under this policy, together with any costs, attorneys' fees and expenses incurred by the insured claimant, which were authorized by [the] Company up to the time of payment and which [the] Company is obligated to pay; or (ii) to pay or otherwise settle with the insured claimant the loss or damage provided for under this policy, together with any costs, attorneys fees and expenses incurred by the insured claimant which were authorized by [the] Company up to the time of payment and which [the] Company is obligated to pay."

¶ 14 Section 9, titled "Limitation of Liability," then provided:

"If the Company establishes the title, or removes the alleged defect, lien or encumbrance *** in a reasonably diligent matter by any method, including litigation and the completion of any appeals therefrom, it shall have fully performed its obligations with respect to that matter and shall not be liable for any loss or damage caused hereby."

¶ 15 Plaintiff additionally attached to the complaint an "Agreed Order of Injunction and Judgment" entered on December 1, 2009, against the Washington property in connection with the housing court action. The order dismissed the housing court action on the Washington property provided that plaintiff did not "rent, use, lease, or occupy the subject premises and shall keep the same vacant and secure until further order of the court." Further, the order required plaintiff to notify the City of Chicago and the court 30 days after any sale, transfer, or change in ownership. The order required plaintiff to schedule an inspection by June 1, 2010, to verify compliance with the order.

¶ 16 Also attached to the complaint was an "Order of Demolition," entered on July 2, 2012, in which the housing court found the Washington property "dangerous, hazardous, unsafe and beyond reasonable repair under the Unsafe Building Statute, 65 ILCS 11-31-1 (1996)." The City of Chicago was ordered to demolish the building located on the property. The order also granted the City of Chicago costs for the demolition.

¶ 17                                II. Motion to Dismiss

¶ 18 On March 4, 2014, defendant filed a motion to dismiss plaintiff's amended complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)). Defendant argued count I of plaintiff's complaint failed to allege sufficient facts to state a cause of action for breach of contract. Further, defendant argued count II of plaintiff's

complaint should be dismissed, as section 155 of the Insurance Code did not apply to defendant as a title insurance company.

¶ 19 On June 6, 2014, the trial court granted defendant's motion to dismiss in part. The trial court denied defendant's motion to dismiss count I of plaintiff's amended complaint, finding plaintiff alleged sufficient facts to state a cause of action for breach of contract. However, the trial court dismissed count II of plaintiff's amended complaint with prejudice. The trial court found that plaintiff could not bring a claim under section 155 of the Insurance Code against defendant, as the Insurance Code did not apply to title insurance companies.

¶ 20 III. Amended Complaint and Third-Party Complaint

¶ 21 On August 10, 2015, plaintiff filed a second amended complaint. Count I of the second amended complaint contained an identical breach of contract cause of action as previously alleged in plaintiff's prior complaint. The second amended complaint included under the dismissed second count's heading, "Count II was dismissed and is not pled in this Amended Complaint." Plaintiff also included a third count for breach of contract. The new count alleged that defendant failed to provide any payments to plaintiff or for the benefit of the property for three years. The complaint alleged that this failure amounted to a breach of the title insurance policy, which required defendant to correct defects in the title "in a reasonably diligent manner." The complaint further alleged that defendant's delay caused plaintiff's inability to secure a rehabilitation loan to prevent the demolition of the Washington property.

¶ 22 On August 19, 2015, defendant filed a third-party complaint against Victor Love, the son of plaintiff and the person from whom plaintiff had purchased the property. While the third-party complaint is not at issue on appeal, we nevertheless briefly discuss it, since the parties went to trial on both complaints. The third-party complaint contained one count for subrogation, which alleged that Love had failed to disclose the second mortgage and the housing court action to defendant at the closing of the property. Defendant sought compensation from Love after defendant paid $15,000 to remove the second mortgage lien from the Washington property's title.

¶ 23 IV. Motion to Dismiss

¶ 24 On September 11, 2015, defendant filed a motion to dismiss count III of plaintiff's second amended complaint pursuant to section 2-615 of the Code, arguing that count III was duplicative of count I of plaintiff's complaint as both were claims for breach of contract and were supported by the same allegations. On October 7, 2015, the trial court granted defendant's motion without prejudice. The trial court did not provide its reasoning.

¶ 25 V. Third Amended Complaint

¶ 26 On October 14, 2015, plaintiff filed her third amended complaint. The new complaint consisted only of one count for breach of contract. The complaint alleged that defendant was obligated under the title insurance policy to insure plaintiff against any losses resulting from title defects in the Washington property. The complaint alleged that after the closing, plaintiff learned of two defects in the title of the Washington property: the Deutsche Bank lien and the housing court action. Defendant had an obligation under the policy to remove these defects in the title in a "reasonable diligent manner," and the complaint alleged that the three-year period

for defendant to remove the title defects constituted a breach of the title insurance policy. The delay in defendant's removal of the title defects resulted in plaintiff's inability to obtain a rehabilitation loan to make necessary repairs to the property. The complaint alleged that the delay additionally caused the ultimate deterioration of the Washington property and the loss of the value of the property in an amount in excess of $150,000 due to the demolition of the property. The earlier count II, arising under the Insurance Code, was not pled, and the third amended complaint specifically stated that "Count II was dismissed and is not pled in this Amended Complaint." On November 20, 2015, defendant filed its answer to count I of plaintiff's third amended complaint, denying the allegations.

¶ 27                             VI. Bench Trial

¶ 28    On April 19, 2016, the trial court conducted a one-day bench trial on plaintiff's third amended complaint and defendant's third-party complaint. The trial court heard testimony from plaintiff and third-party defendant Victor Love, as well as from Eleanor Sharp, defendant's claims counsel. The parties stipulated to the admission of several documents into evidence, including defendant's title commitment and title policy issued to plaintiff.

¶ 29                               A. Plaintiff

¶ 30    Plaintiff testified that she had worked as a part-time mortgage broker since the 1980s. She testified that she had purchased approximately 15 to 20 properties within Chicago and currently owned several properties, including a commercial property, two houses, one condominium, and the land for the Washington property. Plaintiff first discussed purchasing the Washington property from her son, Love, in May 2006. Plaintiff testified she knew Love had experienced difficulties with prior tenants that had damaged the Washington property. Plaintiff observed the property prior to the purchase only from the outside, but plaintiff testified she only noticed the broken and boarded-up windows.

¶ 31    Plaintiff desired to assist her son, and Love provided plaintiff with the contact information for his mortgage company. Upon contacting the mortgage company, plaintiff learned Love was behind in mortgage payments in the amount of $13,000. Plaintiff then provided $13,000 to Love in order to pay off the past-due amount. Plaintiff testified that to the best of her knowledge, Love paid this amount to the mortgage company.[5]

¶ 32    Plaintiff testified that she then entered into an agreement with Love to purchase the Washington property. Plaintiff planned to purchase the Washington property in order to assist her son and to rehabilitate the property as an investment. In order to finance the purchase of the Washington property, plaintiff obtained a mortgage loan from Amalgamated Bank in the amount of $77,470. Plaintiff also acquired $111,000 in cash from Amalgamated Bank upon refinancing an additional property owned by plaintiff, which she also used towards the purchase of the Washington property. Plaintiff provided Amalgamated Bank with a copy of the title commitment issued by defendant. At the closing of the property on November 21, 2006, plaintiff understood that the funds from the purchase price were used to pay off the mortgages

---

[5]We note that this testimony conflicts with the testimony of Love, who testified that plaintiff provided the payment directly to the mortgage company, not to him.

taken out by Love that appeared on the title commitment.[6] Plaintiff testified that at the closing on the Washington property, she was only aware of her own mortgage on the property from Amalgamated Bank.

¶ 33    However, plaintiff became aware of an additional mortgage on the Washington property when a representative from Amalgamated Bank contacted her approximately three weeks after the closing. Plaintiff learned that her son, Love, had previously obtained an undisclosed mortgage from Deutsche Bank in the amount of $39,000.[7] After receiving this information, plaintiff testified that she went to defendant's office on Southwest Highway in December 2006, where she was told she would have to retain an attorney. Plaintiff testified she was given a claim number, but had no further communications with defendant.

¶ 34    Plaintiff testified that she attempted to obtain additional financing for the rehabilitation of the property from Amalgamated Bank, but was unsuccessful due to the undisclosed Deutsche Bank lien. She also testified that she was unable to obtain a rehabilitation loan from either Illinois Federal Savings or Highland Community Bank. However, plaintiff subsequently testified that she was able to obtain a $20,000 rehabilitation loan in April 2007 from Illinois Federal Savings to replace the windows on the second floor and in the basement of the property. Plaintiff also testified she hired an architect for $7000 to draw plans for the rehabilitation of the Washington property. Plaintiff additionally testified she hired an individual to decorate the condominium for $4000. Plaintiff maintained the landscaping; however, no other rehabilitation efforts were completed. Plaintiff testified she attempted to sell the property in either 2009 or 2010. Although plaintiff received offers for the property, plaintiff never reached an agreement with any prospective buyers.

¶ 35    On cross-examination, plaintiff admitted that she inspected the inside of the property as well as the outside of the property prior to the closing. She testified that she knew the property required a substantial amount of work. Plaintiff denied that she was aware of the code violations at the time of the purchase. However, plaintiff reviewed the appraisal for the property on the stand and agreed with a majority of the dilapidated descriptions of the property.

¶ 36    Further on cross, plaintiff first denied that she attempted to sell the Washington property as early as the summer of 2007. However, upon viewing a contract for the Washington property dated June 12, 2007, for the amount of $380,000, plaintiff retracted her testimony. Plaintiff testified that she entered into a contract with a prospective purchaser for the Washington property. Plaintiff then admitted that the building code violations were disclosed to the

---

[6]The closing statement and HUD settlement statement, which were stipulated to by the parties and admitted into evidence, indicated that the purchase price of $184,500 was used to pay off Love's debt owed to Litton Loan Servicing in the amount of $174,671.55 and Chicago Community Ventures in the amount of $5000. No additional mortgage loans were listed on the documents. Love conveyed the Washington property to plaintiff in a warranty deed, dated November 21, 2006, and recorded December 5, 2006, which was also stipulated to and admitted into evidence.

[7]The record demonstrates that, in order to finance his initial purchase of the Washington property, Love acquired two mortgages on the property with Chapel Mortgage on May 23, 2003: one mortgage in the amount of $146,250 and one mortgage in the amount of $39,000. The first mortgage was paid off during the closing of the Washington property on November 21, 2006. The second mortgage was, at some point, sold or transferred to Wilshire Mortgage Company as the servicer for Deutsche Bank. This second mortgage loan was not paid off in the closing of the Washington property and did not appear in defendant's title commitment or title policy.

prospective buyer. Plaintiff testified that the prospective buyer under the contract rescinded due to the inability to obtain proper financing.

¶ 37    Plaintiff additionally admitted that she was aware that Deutsche Bank filed a lawsuit against Love and his wife, as well as Amalgamated Bank, concerning the Washington property in the fall of 2007. Plaintiff testified that her attorney notified defendant by letter, disclosing the existence of the Deutsche Bank second mortgage and building code violations. Plaintiff testified she was unaware that defendant responded to the letter.

¶ 38    Additionally, plaintiff testified that defendant retained an attorney to represent plaintiff in the housing court action. Plaintiff approved of the attorney and was pleased with his efforts. Plaintiff testified that the housing court action was dismissed on December 1, 2009, on the condition that plaintiff would keep the property secured and vacant until the multiple code violations were satisfied. Plaintiff was shown a City of Chicago's emergency motion brought against her to reinstate the demolition of the Washington property when the City discovered that the property was not kept secure and was open and fire-damaged with holes in the interior floors. Plaintiff then admitted she went to court and was told of the new violations, and admitted that she made no effort to satisfy the code violations from 2009 through 2012.

¶ 39    Plaintiff testified she knew that defendant eventually paid Deutsche Bank to remove the mortgage lien from the title of the Washington property. Plaintiff also testified that she knew that defendant paid Amalgamated Bank to remove her own mortgage lien from the title of the Washington property. However, plaintiff testified that she did not become aware that the Deutsche Bank mortgage was not paid off until November 2011.

¶ 40                          B. Victor Love, Third-Party Defendant

¶ 41    Third-party defendant Victor Love testified that he and plaintiff, his mother, had regular contact as they worked together in a restaurant. Love testified that he originally purchased the Washington property as an investment property and that this was his first real estate investment property. Love rented the Washington property to tenants as two separate units. Love experienced difficulties with the tenants, including drug use and damage to the property. The Washington property eventually became vacant and was further vandalized and damaged.

¶ 42    Love testified that he discussed these difficulties with plaintiff, who then expressed a desire to assist Love. Love gave plaintiff the information to contact his mortgage company. Love testified that plaintiff and Love did not discuss or agree to a price for the sale of the Washington property; the sale price was set by the mortgage company. Love testified that it was his understanding that plaintiff made payments to the mortgage company, including the payments Love had missed, to bring his mortgage on the Washington property current. Love testified that plaintiff did not personally pay him $13,000 for the defaulted mortgage. Love testified that he was not aware of the second mortgage on the property from Deutsche Bank at the time he issued a deed to the Washington property to plaintiff at the closing. As a result, he did not disclose the second mortgage from Deutsche Bank to plaintiff.

¶ 43    On cross-examination, Love testified that prior tenants vandalized the Washington property prior to the transfer of ownership to plaintiff. He testified that the tenants vandalized the plumbing, windows, and toilets. Love denied that plaintiff viewed the interior portions of the property prior to purchase, despite impeachment from his deposition testimony that indicated she did make a visual inspection. Additionally, Love denied that he received the complaint filed by the City of Chicago concerning the Washington property in September

- 8 -

2006. Love testified that he was not at the property on July 11, 2006, when an inspection by the City occurred, and testified that the last time he visited the property was in 2005. Love reviewed the document that indicated a notice was issued regarding the dangerous and unsafe conditions to the property. However, Love testified he never received this notice, though he admitted the notice was sent to his correct post office box.

¶ 44 Love was shown a court order dated November 14, 2006, which required him to be present for an inspection of the property. Love testified he did not recall being present at the court hearing. Love admitted that the court order read, "Victor Love is granted 28 days to answer," and further that default was not entered against him. Love also admitted that his signature was on a document, titled "Affidavit of Title, Covenant and Warranty," dated November 21, 2006. Love testified that he truthfully signed the affidavit because at the time of the signing he had not received notice of the housing court action. Love testified that he believed he signed the documents at defendant's office; however, he admitted it was possible that it could have been at the office of another title company.

¶ 45 <center>C. Eleanor Sharp, Claims Counsel for Defendant</center>

¶ 46 Eleanor Sharp testified that she worked for defendant as a claims counsel and was the claims attorney assigned to plaintiff's claim. Sharp testified that defendant's policy requires insureds to provide written notice of the title defects to be sent to the address listed on the policy. Sharp testified she received a written notice of the title defects in a letter from plaintiff's attorney, dated December 27, 2007. The letter contained defendant's incorrect address; however, Sharp eventually came into possession of the letter. Sharp issued a letter in reply upon receipt, dated January 15, 2008. The letter indicated that defendant would begin processing plaintiff's claim.

¶ 47 Sharp testified that she first determined that the Deutsche Bank mortgage was covered under the terms of plaintiff's title insurance policy and that an exclusion did not apply. Sharp testified that Love did not disclose the second mortgage from Deutsche Bank on the Washington property. Sharp did not suspect any collusion between plaintiff and Love because she was unaware that Love was plaintiff's son. Sharp testified she did not personally examine the title search that defendant conducted on the Washington property.

¶ 48 Sharp testified that defendant cured all of the title defects on the Washington property by December 2009. She further testified that defendant asserted an equitable subrogation claim on behalf of Amalgamated Bank. This claim formed the basis of defendant's settlement with Deutsche Bank to remove the lien against the property. Additionally, an appraisal of the Washington property was conducted in May 2009, wherein it was valued between $25,000 and $35,000. Sharp testified that defendant came to an agreement for the removal of the Deutsche Bank mortgage in the amount of $15,000 in July 2009. Defendant also retained an attorney to represent plaintiff in the housing court action, and defendant paid $17,000 in attorney fees. The housing court action was resolved on December 1, 2009. Sharp additionally testified that payments were also made in the amount of $44,000 to Amalgamated Bank to pay off plaintiff's own mortgage on the property.

¶ 49 Sharp relayed the information regarding the curing of the title defects on the property to plaintiff's attorney in either 2009 or early 2010. Sharp also testified that if plaintiff had given defendant notice that she desired to obtain a rehabilitation loan, defendant could have provided an indemnity letter to Amalgamated Bank. This would have allowed defendant to obtain the

rehabilitation loan. Yet, plaintiff failed to do so.

¶ 50                                D. Trial Court's Findings

¶ 51     On May 19, 2016, the trial court entered judgment in favor of defendant and judgment in favor of Love. The court found that plaintiff failed to provide evidence to establish the required elements of her breach of contract claim, including that defendant's conduct constituted a breach of the title insurance policy, proximate cause, and cognizable damages. The trial court recognized that plaintiff argued that the three-year period in which defendant cured the defects constituted a breach of contract, but found that plaintiff failed to provide evidence to establish when this period commenced and concluded. The court found plaintiff's arguments merely attempted to place the burden on defendant to prove that the title defect claims were resolved within a reasonable period of time under the policy. As a result, plaintiff failed to prove by a preponderance of the evidence that defendant's conduct constituted a breach of the insurance policy.

¶ 52     Furthermore, the court found that plaintiff did not prove damages proximately caused by the breach. The trial court noted that plaintiff argued she sustained damages in the amount of $110,000. However, the trial court found that the evidence did not establish a basis for this amount other than the amount pertained to plaintiff's investment expenses in the property. These amounts included window replacements in the amount of $20,000; architect fees in the amount of $7000; condominium attorney fees in the amount of $4000; and other attorney fees in the amount of $6000. The trial court found that these expenses were merely related to plaintiff's commercial real estate investment in the property and were not recoverable damages for the alleged breach of the title insurance policy. The court noted that, to the extent plaintiff's damages included plaintiff's loan used to obtain the property, the evidence indicated that defendant had already paid that amount. Additionally, the court denied plaintiff's claims of $441,000 in exemplary damages, as plaintiff failed to offer any basis for the award of these damages. Therefore, plaintiff failed in her burden of proof to satisfy the preponderance of the evidence standard for her claim against defendant for breach of the title insurance policy.

¶ 53     On June 16, 2016, plaintiff filed her notice of appeal from the order of the trial court on May 19, 2016, entering judgment in favor of defendant and against plaintiff. This appeal follows.

¶ 54                                        ANALYSIS

¶ 55     On appeal, plaintiff raises a number of arguments with respect to the trial court's findings on plaintiff's breach of contract claim. Plaintiff challenges the trial court's holding with respect to the finding that plaintiff failed to prove a breach of the title insurance policy requiring defendant to remove defects in a "reasonably diligent manner." Plaintiff also contests the trial court's finding that plaintiff failed to prove proximate cause and damages. Plaintiff additionally raises new issues that were not addressed in the bench trial, including the applicability of section 155 of the Insurance Code and the implied covenant of good faith and fair dealing.

¶ 56                                    I. Standard of Review

¶ 57    The parties disagree as to our standard of review of the trial court's decision. Defendant contends that the "manifest weight of the evidence" is the proper standard, while plaintiff argues that the standard that must apply is the "clearly erroneous" standard.

¶ 58    Our supreme court has limited the clearly erroneous standard to the review of administrative decisions on mixed questions of fact and law. *Samour, Inc. v. Board of Election Commissioners*, 224 Ill. 2d 530, 542 (2007). "In all other civil cases, we review legal issues *de novo* and factual issues under a manifest weight of the evidence standard." *Samour*, 224 Ill. 2d at 542. The Illinois Supreme Court has accepted the application of the clearly erroneous standard of review to the review of decisions other than that of an administrative agency in limited situations, such as a trial court's ruling on allegations of discrimination in jury preemptory challenges. See *McDonnell v. McPartlin*, 192 Ill. 2d 505, 527 (2000). However, plaintiff fails to properly address this issue and further fails to provide a legal basis as to why this court should expand this narrow standard of review to apply to the review of the trial court's decision in the bench trial of this matter. Plaintiff cites only to Illinois case law involving review of administrative decisions to which the clearly erroneous standard applies.

¶ 59    The standard of review that this court applies to a trial court's decision following a bench trial is to determine if the judgment is based on facts that are against the manifest weight of the evidence. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 51 (2009). "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence." *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002). The manifest weight of the evidence standard affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony. *People v. Jones*, 215 Ill. 2d 261, 268 (2005).

¶ 60    The parties agree that this case also involves the interpretation of the terms of a title insurance policy contract, which presents an issue of law that is reviewed *de novo*. *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 156 Ill. 2d 384, 391 (1993). "Under the *de novo* standard of review, the reviewing court does not need to defer to the trial court's judgment or reasoning." *Platinum Partners Value Arbitrage Fund, Ltd. Partnership v. Chicago Board Options Exchange*, 2012 IL App (1st) 112903, ¶ 12. "*De novo* review is completely independent of the trial court's decision." *Platinum Partners Value Arbitrage Fund, Ltd. Partnership*, 2012 IL App (1st) 112903, ¶ 12. *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 61              II. Delay in Removing Encumbrances on the Title of the Property

¶ 62    Plaintiff claims that defendant failed to cure title defects against the Washington property in a "reasonably diligent manner." The trial court found that plaintiff failed to offer evidence that the defects in the title were not cured in a "reasonable diligent manner."

¶ 63    "[T]he rules applicable to contract interpretation govern the interpretation of an insurance policy." *Founders Insurance Co. v. Munoz*, 237 Ill. 2d 424, 433 (2010). However, an insurance contract will be liberally construed in favor of the insured. *First Chicago Insurance Co. v. Molda*, 2015 IL App (1st) 140548, ¶ 33. When analyzing an insurance policy, the primary objective is to give effect to the intent of the parties. *Valley Forge Insurance Co. v. Swiderski*

*Electronics, Inc.*, 223 Ill. 2d 352, 362 (2006). An insurance policy is construed as a whole in order to give effect to every provision, as it must be assumed that every provision was intended to serve a purpose. *Valley Forge Insurance Co.*, 223 Ill. 2d at 362. "[W]here policy provisions are unambiguous, the court must give the words of the provisions their plain and ordinary meaning." *Indiana Insurance Co. v. Liaskos*, 297 Ill. App. 3d 569, 573 (1998).

¶ 64        Under the title insurance policy, defendant agreed to insure plaintiff against "any defect in or lien or encumbrance on the title" of the Washington property. Defendant does not dispute the fact that the Deutsche Bank mortgage and the housing court action were defects in title, and plaintiff does not dispute the fact that defendant resolved these defects. Instead, plaintiff argues that defendant breached section 9(a) of the title insurance policy, which required defendant to remove the encumbrances on the title "in a reasonably diligent manner," claiming that defendant took three years to remove the title defects. Plaintiff's argument requires us to consider both (1) the point in time that triggered defendant's obligations under the policy to initiate the removal of the title defects and (2) defendant's actions once its obligations to remove the title defects arose. We consider each issue in turn.

¶ 65        First, the trial court found that plaintiff failed to provide sufficient evidence to establish the date upon which plaintiff provided sufficient notice to defendant in order to trigger the claim process under the policy. On appeal, plaintiff claims that defendant's obligations were triggered when she provided oral notice of the claim to defendant through a personal encounter with a representative from defendant's office where plaintiff was issued a claim number. Plaintiff testified this encounter occurred in December 2006, shortly after plaintiff first discovered the Deutsche Bank lien through a representative of Amalgamated Bank. Plaintiff did not provide any evidence that she had any further contact with defendants after this initial encounter.

¶ 66        In response, defendant argues that plaintiff did not provide proper written notice to defendant until December 27, 2007, as required under the policy to trigger the claims process. Additionally, defendant argues that plaintiff's appearance before an unknown party regarding the title defect claim was not proper notice under the policy.[8] Sharp, defendant's claim counsel, testified she received a written letter, dated December 27, 2007, from plaintiff's attorney. Sharp confirmed receipt of this written notice by responding in a letter, dated January 15, 2008, which indicated that defendant would initiate an investigation to begin curing the title defects.[9]

¶ 67        Under the terms of the title insurance policy, plaintiff was required to submit written notice in order to trigger the claim process. Section 3 of the policy required the insured to "notify the Company promptly in writing" in the event a claim arose. If the policy language is clear and unambiguous, the court will apply the provisions of the agreement using their plain and ordinary meaning. *Indiana Insurance Co.*, 297 Ill. App. 3d at 573. In the case at bar, plaintiff failed to provide written notice to defendant until December 27, 2007. Plaintiff does not argue

---

[8]During the bench trial, it was alluded to during opening arguments and in an objection during plaintiff's testimony that plaintiff appeared to the affiliated offices of "Stewart Title," rather than "Stewart Title Guaranty Company." However, no witness testified to the name of the company where plaintiff appeared.

[9]Plaintiff's letter, dated December 27, 2007, and defendant's letter, dated January 15, 2008, were stipulated to and entered into evidence at the bench trial.

that she provided written notice prior to this date. Defendant entered into a settlement to remove the disputed Deutsche Bank mortgage from the title by July 2009, within 18 months of December 27, 2007. In fact, defendant removed all title defects against the Washington property, including plaintiff's own mortgage lien on the property, by December 2009, within a two-year period. Therefore, we cannot find that it was against the manifest weight of the evidence for the trial court to conclude that plaintiff had failed to establish that defendant's obligations were triggered prior to December 2007, as she claimed.

¶ 68    The issue is whether the 18-month period in which defendant cured the title defects were performed within a "reasonable diligent manner" as required under the policy. The trial court found that plaintiff failed to prove that defendant did not cure the title defects in a reasonably diligent manner by a preponderance of the evidence. We cannot find that this conclusion was against the manifest weight of the evidence. The question of whether an 18-month period constitutes a "reasonable" period of time cannot be decided as a matter of law, as this is an issue of fact to be resolved by the trial court. See *Brown v. State Farm Fire & Casualty Corp.*, 33 Ill. App. 3d 889, 894 (1975) (finding that a reasonable period of time for an insurer to resolve a claim depends on the circumstances of each case and is a question of fact unless the period of time constitutes a period so brief or so long as to be clearly reasonable or unreasonable).

¶ 69    In the case at bar, plaintiff admits that whether this period of time is reasonable for defendant to cure the defects is a question of fact for the trial court's determination. However, plaintiff argues that other courts in other cases have determined much shorter periods of time to be unreasonable. To support her argument, plaintiff cites only to case law applying section 155 of the Insurance Code, which allows for the recovery of punitive damages in the event an insurance company is liable for the unreasonable delay in settling a claim where the court deems the delay "vexatious and unreasonable." 215 ILCS 5/155 (West 2012). We do not find this persuasive as it is not applicable to the case at bar.

¶ 70    First, on June 6, 2014, the trial court dismissed plaintiff's count II, which stated her claim under section 155 of the Insurance Code. On October 14, 2015, plaintiff filed an amended complaint wherein count II was not pled and merely stated "Count II was dismissed and is not pled in this Amended Complaint." Appellate review is forfeited if a party fails to refer to, adopt, or otherwise incorporate prior pleadings in amended complaints. *Barnett v. Zion Park District*, 171 Ill. 2d 378, 384 (1996). Plaintiff failed to adopt or incorporate count II in her amended complaint. In fact, plaintiff's amended complaint clearly stated that the claim was not pled. Plaintiff proceeded solely on her breach of contract claim. As a result, plaintiff forfeited this claim, which is unreviewable on appeal.

¶ 71    We further note that plaintiff fails to establish that the Insurance Code is applicable to defendant in the case at bar. The Insurance Code expressly precludes its application to "companies now or hereafter organized or transacting business under the Title Insurance Act [(215 ILCS 155/1 *et seq.* (West 2012))]." 215 ILCS 5/451 (West 2012). Defendant claims that it is organized and transacts business under the Title Insurance Act, and plaintiff does not dispute this fact. Thus, by its express terms, the Insurance Code does not apply. Additionally, the Title Insurance Act does not contain a similar provision, holding title insurance companies liable for an unreasonable delay in settling a claim. See 215 ILCS 155/1 *et seq.* (West 2012).

¶ 72    Instead, Illinois courts have held that "[t]he scope of a title insurer's liability is properly defined by contract." *First Midwest Bank, N.A. v. Stewart Title Guaranty Co.*, 218 Ill. 2d 326,

341 (2006). In the case at bar, the insurance policy at issue does not define or provide any additional clarity as to the appropriate length of time for the cure in the title defect to be removed to be in a "reasonably diligent manner." As a result, we cannot say as a matter of law that the 18-month period constituted a breach of the policy, regardless of whether courts in other cases have found shorter periods to be unreasonable. Accordingly, whether defendant acted in a "reasonably diligent manner" depends on the particular facts concerning defendant's conduct.

¶ 73    Plaintiff argues that once defendant's obligations to cure the title defects arose, defendant's conduct amounted to a breach of the policy because defendant pursued time-intensive litigation designed to settle the liens for less money, rather than immediately tendering the full face value of the lien. We do not find this argument persuasive.

¶ 74    The title insurance policy grants defendant discretion in the manner in which claims are to be resolved. Section 4(b) of the policy expressly allows defendant the ability "to institute or prosecute any action or proceeding *** to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured." Additionally, section 6(b) allows defendant the option "to pay or otherwise settle with other parties for or in the name of an insured claimant any claim insured against under this policy." See *Sabatino v. First American Title Insurance Co.*, 308 Ill. App. 3d 819, 824 (1999) (recognizing that the title insurance company had the right to elect alternative methods to resolve its claims as provided for in the terms of the policy). Under the terms of the policy, defendant was not required to remove the Deutsche Bank mortgage solely by immediately tendering the full face value of the lien.

¶ 75    Plaintiff presented no evidence that defendant acted in an unreasonable manner that would constitute a breach of the title insurance policy. Plaintiff merely argued that the process that defendant used prejudiced plaintiff. Defendant's claim representative, Sharp, testified that defendant initiated an equitable subrogation claim after Sharp determined that the Deutsche Bank mortgage was covered under plaintiff's title insurance policy. Sharp testified that this equitable subrogation claim formed the basis of the agreement with Deutsche Bank for the removal of the second mortgage from plaintiff's title for the amount of $15,000. Defendant also retained an attorney to represent plaintiff in the housing court action wherein defendant paid $17,000 in attorney fees. Sharp additionally testified that payment was also made in the amount of $44,000 to Amalgamated Bank to pay off plaintiff's own mortgage on the property. Thus, defendant's conduct was permissible under the policy. Plaintiff never advised defendant that time was a factor in settling the liens because the liens were affecting her ability to obtain a rehabilitation loan.

¶ 76    Thus, the trial court's finding that plaintiff failed to prove that defendant's conduct amounted to a breach of the title insurance policy, which required the removal of title defects in "reasonably diligent manner," is not against the manifest weight of the evidence. We therefore affirm the trial court's judgment.

¶ 77              III. Failure to Prove Damages Proximately Caused by Delay

¶ 78    We next address plaintiff's argument that the trial court erred in finding plaintiff failed to establish cognizable damages proximately caused by defendant's conduct.

¶ 79    "The purpose of title insurance is to protect a transferee of real estate from the possibilities of loss through defects that may cloud title." *First National Bank of Northbrook, N.A. v. Stewart Title Guaranty Co.*, 279 Ill. App. 3d 188, 192 (1996). However, title insurance does

- 14 -

not provide coverage of the loss of value to the land itself. *Rackouski v. Dobson*, 261 Ill. App. 3d 315, 318 (1994). "If the value of the property appreciates or depreciates, the title policy is not affected." *McLaughlin v. Attorneys' Title Guaranty Fund, Inc.*, 61 Ill. App. 3d 911, 916 (1978). Instead, a title insurance policy insures the title against defects, which may damage the insured's interest in the property. *McLaughlin*, 61 Ill. App. 3d at 916.

¶ 80        In the case at bar, plaintiff argues she produced sufficient evidence of her damages at trial, including the costs of demolition, as well as various other expenses lost in her investment in the Washington property, including fees incurred by installing new windows and hiring an architect. However, these are not recoverable damages under the title insurance policy. Title insurance only protects against damages caused by undisclosed defects in plaintiff's title to the Washington property. See *First National Bank of Northbrook, N.A.*, 279 Ill. App. 3d at 192. Plaintiff does not dispute that defendant cured the undisclosed defects that existed at the time of plaintiff's purchase of the property. Since plaintiff failed to produce evidence at the trial of damages properly related to a timely failure to cure defects in title to the Washington property, we cannot say the trial court's finding as to damages is against the manifest weight of the evidence.

¶ 81        Additionally, the title insurance policy evinces an intent by the parties to preclude defendant from liability from the loss in value to plaintiff's property. Section 9 of the insurance policy limits the defendant's liability to only the removal of the title defect, and states: "If the Company establishes the title, or removes the alleged defect, lien or encumbrance *** in a reasonably diligent manner by any method, including litigation *** it shall have fully performed its obligations to that matter." The policy further indicates that once defendant cures the title defects, the defendant "shall not be liable for any loss or damage caused thereby." See *First Midwest Bank, N.A. v. Stewart Title Guaranty Co.*, 218 Ill. 2d 326, 341 (2006) ("[t]he scope of a title insurer's liability is properly defined by contract"). Thus, under the policy agreement, defendant cannot be held liable for damages or defects to the property itself, not caused by the title defects.

¶ 82        Plaintiff also failed to produce evidence to establish that defendant's conduct was a proximate cause to her damages. Plaintiff testified that she was aware that the Washington property required substantial repairs. Plaintiff knew prior tenants had severely damaged the property. Even if defendant had disclosed the title defects to plaintiff prior to her purchase of the Washington property, plaintiff still would have been obligated to pay the cost for repairs to prevent the demolition of the Washington property. Due to the severely dilapidated condition of the Washington property, the amount required to repair the Washington property may have been cost-prohibitive. Plaintiff presented no evidence to establish she possessed the financial means to satisfy the building code violations upon purchase of the property, or even what the work would require in time or expense.

¶ 83        Plaintiff testified that she attempted and was unable to secure a loan from multiple financing institutions in order to finance the rehabilitation of the Washington property. However, plaintiff failed to produce completed loan applications or other documents to show that she attempted and was denied financing due to the title defects. Plaintiff merely produced one letter from Amalgamated Bank, which requested plaintiff to submit a number of listed

documents in order for the bank to reevaluate her request for a rehabilitation loan.[10] However, there is no evidence that plaintiff complied with this request, nor is there evidence to suggest that plaintiff was ever denied the loan based on the title defects. Even if plaintiff was unable to secure a rehabilitation loan due to the title defects, Sharp testified that defendant would have insured over the Deutsche Bank lien to allow plaintiff the opportunity to secure the rehabilitation loan while the litigation was pending. Plaintiff only needed to provide defendant with a request to do so. Sharp testified that plaintiff failed to do so.

¶ 84 After the title defects were cured, plaintiff testified that she made no effort to satisfy the code violations from 2009 through 2012. Plaintiff testified that she did not even attempt to obtain financing to rehabilitate the Washington property. Plaintiff had a sufficient period of time to secure the premises and obtain new financing, yet plaintiff failed to take any action whatsoever.

¶ 85 Furthermore, the evidence at the bench trial revealed that plaintiff's own conduct may have contributed to the demolition of the Washington property. The housing court action was resolved on December 1, 2009, when the court issued an injunction against the City of Chicago on the condition that plaintiff would keep the Washington property secure and vacant. However, the City of Chicago filed an emergency motion claiming plaintiff violated this order on November 29, 2011, when an inspection revealed that plaintiff failed to secure the premises and that the property was open, which resulted in fire damage and holes in the flooring caused by unknown persons living on the premises. The demolition order was then entered on July 2, 2012, against the Washington property as a public safety hazard.

¶ 86 Therefore, the decision of the trial court finding that plaintiff failed to produce evidence of cognizable damages that were proximately caused by defendant's conduct is not against the manifest weight of the evidence.

¶ 87 IV. Implied Covenant of Good Faith and Fair Dealing

¶ 88 Finally, plaintiff argues that we must address the issue as to whether defendant's delay in removing the encumbrances on the title also violated defendant's duty of good faith and faith dealing. The trial court did not rule on this issue, as plaintiff argues this claim for the first time on appeal. A party "cannot properly raise a new theory for recovery for the first time on appeal." *Federal Insurance Co. v. Turner Construction Co.*, 277 Ill. App. 3d 262, 268 (1995). Plaintiff failed to plead this theory in her complaint and failed to argue this issue before the trial court. Thus, plaintiff forfeited this claim and this issue cannot be considered on appeal.

¶ 89 CONCLUSION

¶ 90 The judgment entered in favor of defendant title insurance company is affirmed, where plaintiff failed to produce evidence establishing that defendant's conduct in curing title defects constituted a breach of the title insurance policy, which required removal of defects in a "reasonably diligent manner."

¶ 91 Affirmed.

---

[10]We note that this letter was not disclosed to defendant until the date of the trial. The letter was admitted into evidence over defendant's objection.