**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230315-U

Order filed October 29, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| MARSHA TATE, | ) | Du Page County, Illinois, |
| | ) | |
|    Petitioner-Appellant, | ) | Appeal No. 3-23-0315 |
| | ) | Circuit No. 14-D-1936 |
|       v. | ) | |
| | ) | |
| | ) | |
| WESLEY TATE, | ) | Honorable |
| | ) | Anne T. Hayes, |
|    Respondent-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice McDade and Justice Albrecht concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:  The trial court's finding that certain payments received by husband were sale proceeds from the book of his business and, thus, neither employment income nor subject to maintenance was not against the manifest weight of the evidence. The trial court's grant of respondent's motion for declaratory judgment is affirmed.

¶ 2     Petitioner, Marsha Tate, appeals the trial court's finding that the payments respondent,

Wesley Tate, receives pursuant to the Aspiring Legacy Financial Advisors Program (ALFA

Program) are not "employment income" as defined by the judgment for dissolution of marriage (judgment) and, therefore, not subject to maintenance payments. For the reasons set forth below, we affirm the trial court's judgment.

¶ 3                                        I. BACKGROUND

¶ 4        This is the second appeal in this case. See *In re Marriage of Tate*, 2019 IL App (2d) 170579-U. The parties were married on May 16, 1987; petitioner filed a petition for dissolution of marriage on September 19, 2014. At the time of the dissolution trial, respondent was employed as a financial advisor, or FA, at UBS. Judge John Demling presided over the trial.

¶ 5                                        A. Pre-Decree

¶ 6        The pre-decree record is voluminous, and we recount the evidence only as it pertains to the issue on appeal—whether the ALFA payments are "employment income" subject to maintenance payments or, instead, proceeds from the sale of respondent's book of business and exempt from the maintenance calculation.

¶ 7        Dennis Christensen, the UBS branch manager, testified regarding respondent's employment. Christensen was instrumental in respondent's transition from his prior employer, Morgan Stanley, to UBS, including forging an agreement between respondent and UBS wherein respondent would receive a financial incentive to become a UBS employee. As noted in the first appeal, this is also known as an "employee transition program" (ETP), and can be described as follows:

> "[A] type of compensation structure utilized in the financial services industry to recruit and retain employees. Pursuant to an ETP, an employee receives money at the time of hire based on recent revenue produced. The upfront payments are in the form of 'loans' that are

2

forgiven annually over an extended contract period. However, the loans are only forgiven as long as the recipient remains employed at the company throughout the contract term." *Tate*, 2019 IL App (2d) 170579-U, ¶ 10.

¶ 8 "The amount [of loans] forgiven each year is treated as taxable income in the year it is forgiven \*\*\*." *Id.* ¶ 12. Respondent earned a guaranteed cash loan up front and additional cash loans once he was successful in transferring his client accounts from Morgan Stanley to UBS. His loans were forgiven over a period of eight years (2011-2019).

¶ 9 At the time of trial, respondent's assets under management were more than double what they were when he was hired by UBS in 2011, and his 12-month trailing commission had increased by $900,000.

¶ 10 Christensen later described the ALFA Program as a "retirement program" available to eligible financial advisors. He indicated that the first three years of the ALFA Program were considered active service for the ETP loan forgiveness. Respondent's testimony suggested that he did not have any immediate plans to retire. On cross-examination, respondent testified to the ALFA Program as follows:

"Q. So if you chose to retire, you can seek the benefits of the Alpha [*sic*] Program; can you not?

A. The benefits are crap.

Q. Can you seek the benefits of the Alpha [*sic*] Program?

A. I don't see them as benefits.

THE COURT: The question is: Can you seek—can you attempt to get them, if you want?

THE WITNESS: Can I attempt to get them?

3

THE COURT: Yes.

THE WITNESS: Yeah, but they don't exist.

MR. SCHILLER: Well, the record has Mr. Christenson's [*sic*] testimony, so I'm not going to argue with him."

Petitioner's counsel attempted to continue this line of questioning, at which point respondent's counsel objected to the subject being outside the scope of the direct examination. The pre-decree trial court sustained the objection on the grounds of relevancy, stating that it was not going to make its determination based upon speculation as to what respondent might do in the future. The pre-decree trial court said that was an issue for another time.

¶ 11    The pre-decree trial court received as evidence the 2016 financial advisor compensation plan, which included a synopsis of the ALFA Program, describing it as an opportunity for retiring financial advisors "to smoothly transition client accounts to other Financial Advisors and continue to receive compensation from those accounts for up to five more years, subject to the terms and conditions of the controlling documents." It explained that the retiring financial advisor "may be eligible to remain as active employees for up to two years" "to assist in the *book transition*[.]" (Emphasis added.) It was also highlighted that the payments were based on actual production during the program.

¶ 12    The July 17, 2017, judgment set forth the following findings as they relate to the issue on appeal:

"**7. The Marital Estate**

* * *

7.4 *The Court has considered all the factors set forth in Section 503(d) in making its determination with respect to the disposition of assets.*

7.5 The Court finds that *[respondent] has a far greater ability to acquire capital assets and income in the future*. \*\*\*.

\*\*\*

7.7 The court finds that, given the extent of the marital estate, both parties will be in a relatively strong economic position when the division of property becomes effective. \*\*\* *However, [respondent] certainly has greater employment skills and employability.*

\*\*\*

7.9 *After considering the factors set forth in Section 503(d)*, the evidence presented at trial, and the arguments of counsel, *the Court believes that a disproportionate share of marital assets is equitable under the circumstances*. \*\*\* The Court does not intend to make a specific percentage allocation but notes that the allocation of assets is slightly greater than 60 percent in favor of [petitioner] and slightly less than 40 percent in favor of [respondent].

\*\*\*

7.11 The Court finds that, with respect to indebtedness, the primary indebtedness of the parties are the loan balances to UBS as a result of the promissory notes outstanding related to [respondent]'s employment. The Court notes that this indebtedness is indeed contingent indebtedness. And the exact outstanding balance depends on [respondent]'s employment with UBS.

7.12 *The Court also finds that this indebtedness is affected by the ALFA program which will also reduce the indebtedness to UBS for these loans in the event of [respondent]'s retirement. Based on the foregoing, any and all indebtedness to UBS as a result of the outstanding loans through his employment with UBS are awarded to [respondent].*

\* \* \*

5

**9. Maintenance**

* * *

9.6 The Court will award maintenance in the amount of $15,000 per month. In addition, *[petitioner] shall receive as additional maintenance 40 percent of any monies received in excess of a gross of $450,000.*

9.7 *In essence, the Court is awarding maintenance in the amount of 40 percent of the funds received by [respondent].*

9.8 *The Court finds that [respondent]'s income is made up from a number of sources. For the purposes of support, monies received by [respondent] will include his salary, performance bonuses, commissions, loan proceeds he receives or controls as incentives and for his performance, as well as investment income from all sources ***.* This additional 40% of income payment shall be calculated, trued up and paid on a quarterly basis."* (Emphases added.)

¶ 13    Thereafter, the court ordered as follows:

"Article II. Maintenance

***

b. Based upon the evidence presented, the Court awards maintenance payable by [respondent] to [petitioner] ***. *In addition, [petitioner] shall receive from [respondent] as additional maintenance 40 percent of any monies received by [respondent] as defined in c. below in excess of an annual gross of $450,000. ***.*

c. *For purposes of support, monies received by [respondent] shall include all employment income including salary, bonuses, incentive loans and awards in the form of loans from*

6

*his employment, commissions, and investment income from all sources except investment income from his share of the marital estate.*

\* \* \*

Article III. Disposition of Property

\*\*\*

b. *All indebtedness to UBS as a result of the outstanding loans through [respondent]'s employment with UBS are [respondent]'s responsibility. \*\*\*."*

¶ 14                                    B. Post-Decree

¶ 15        Due to unrelated maintenance disputes that arose post-decree, petitioner issued a subpoena to UBS seeking documentation regarding respondent's income. Pursuant to the subpoena, UBS produced a paystub showing that, in September 2020, respondent received an ALFA payment in the amount of $1,379,108.38. Respondent had apparently entered the ALFA Program in August 2019. Judge Anne Hayes presided over the post-decree declaratory judgment proceeding that ensued.

¶ 16                                    i. ALFA Program

¶ 17        Due to the complex nature of the ALFA Program, we first provide a background of the program based upon documentary evidence received in the declaratory judgment proceeding that is the subject of this appeal. The ALFA Program serves to transition a retiring financial advisor's client accounts to another UBS financial advisor and has two phases—ALFA Plus and ALFA Core. "Together, they give eligible FAs the opportunity to earn up to 300% of their production over the course of the program." The 2019 financial advisor compensation plan describes, the first phase, ALFA Plus, as follows:

> "Qualifying FAs sign in an agreement in a form then provided by the Firm ("Commitment Agreement") to enter ALFA Core within a 2- to 5- year period ("Commitment Period"). In return for signing the Commitment Agreement, these FAs receive up to 100% of their trailing 12-month production (at time of Commitment Agreement execution) as an upfront cash loan ***. The upfront loan is provided in addition to any ALFA Core payments for which the FA may qualify under ALFA Core. ***."[1] (Emphases omitted.)

The 2019 compensation plan describes ALFA Core as follows:

> "Legacy FAs are eligible to receive monthly payments for a 5-year period—2 years as an employee (Active Phase) and 3 years post-employment (Inactive Phase). Legacy FAs have an opportunity to earn up to 200% of production on the transitioned accounts over the course of the 5 years ***.
>
> * * *
>
> ALFA Core offers a survivor death and disability benefit if the Legacy FA dies or experiences a disability during the 5-year period that results in the inability to maintain required registrations and/or complete all required continuing education/training responsibilities."

¶ 18     The head of UBS's recruiting and retention group, David Larado, authored an article (Larado Article) describing UBS's "compensation and reward" structure, including the ALFA Program. The article described the ALFA Program as a "*reward*[] *** for transitioning *your business* on your timeline to advisors of your choice and preserving client relationships." (Emphases added.) It also provided, "Our highly flexible ALFA program r*ewards you for the business you have built over the life of your career* and allows you to continue to earn income during the transition period." (Emphasis added.) Additionally, "We are incredibly proud of our ALFA program, which is among the most competitive transition programs in the industry and is focused on what matters most—you and *your clients*." (Emphasis added.)

¶ 19     Jane Eisland, a UBS executive director, authored a separate article (Eisland article), which begins with the phrase, "Transition *your business* on your terms." (Emphasis added.) Like the

---

[1] Respondent elected not to take the upfront loan and, instead, received the ALFA Plus monies as staged payments over four years.

Larado article, it describes the ALFA Program as a reward for the business built by the financial advisor. The section pertaining to ALFA Core provides, "Upon entering ALFA Core, you *transition your book* to a successor Financial Advisor and remain an active employee for a period of time, ensuring a smooth transition for you and *your clients*." (Emphases added.)

¶ 20    A 2017 ALFA Program overview document stated, "ALFA gives you the freedom to gradually reduce your responsibilities while being rewarded for the business you've worked to build."

¶ 21    Respondent's ALFA Plus Commitment Agreement, dated August 22, 2019, set forth the specific dates and terms of his participation in the ALFA Program as follows:

> "Commitment Period.
> ALFA Plus begins with the Commitment Period, which is scheduled to begin on **8/1/2019** ('Commitment Period Start Date') and end on **8/1/2021** ('Commitment Period End Date'). During the Commitment Period you will remain a full-time at-will employee and will continue to work as a Financial Advisor. In exchange for the ALFA Plus Commitment Benefits \*\*\*, you have voluntarily agreed to enter the ALFA Core component of ALFA ('ALFA Core') as a Legacy FA on **8/1/2021** ('ALFA Core Start Date'). In order to enter ALFA Core, you must satisfy the ALFA Core eligibility requirements in effect immediately before the ALFA Core Start Date. This includes your satisfying and complying with all ALFA Core requirements, including, without limitation, entering into an ALFA Core Legacy FA Agreement.
>
> ALFA Core Transition Period.
> As a Legacy FA in ALFA Core, your ALFA Core Transition Period will consist of two phases: an <u>Active Phase</u> and an <u>Inactive Phase</u>. The Active Phase is scheduled to begin on the ALFA Core Start Date and end on the date your employment terminates ('Employment Termination Date'), which you have voluntarily agreed will be on **9/30/2023**. During the Active Phase, you remain a full-time at-will employee. The Inactive Phase is scheduled to begin on your Employment Termination Date and end on 7/31/2026 ('Scheduled Inactive Phase End Date'). During the Inactive Phase you will no longer be an employee of the Firm." (Emphases in original.)

An August 17, 2021, letter from UBS to respondent indicated that the ALFA Core Start Date was changed, at respondent's request, to August 1, 2022.

¶ 22            Respondent signed the ALFA Plus Transition Payment Award Agreement, which reflected the specific terms of his receipt of the ALFA Plus payments. Respondent's payments were set forth as follows: $1,379,108.38 in September 2020; $1,350,989.16 in September 2021; $1,322,869.94 in September 2022; and $1,294,750.72 in September 2023. UBS was not required to make these payments if respondent failed to enter and complete ALFA Core for any reason other than death, disability, or termination without cause. In the event of death, disability, and termination without cause, UBS would make the remaining ALFA payments as a discounted accelerated lump sum to respondent or his estate. Respondent's right to the payments was also conditioned on him not performing in a manner that significantly contributes to UBS's financial loss or significant downward restatement of published results or engaging in conduct that is detrimental to UBS. Respondent was also subject to non-competition and non-solicitation clauses. The ALFA Plus payments "are not earned *** until all conditions in this Agreement are satisfied, including, without limitation, entering and completing ALFA Core ***."

¶ 23            The ALFA Core Agreement, dated August 30, 2022, welcomed respondent to the ALFA Core phase and indicated that Alan Wojtowicz was taking over respondent's client accounts. As such, respondent "committed to use [his] best efforts to ensure a successful transition of the ALFA Accounts ***." As of the start date, respondent began receiving monthly continuation fees, which are calculated as a percentage of the gross production of the ALFA accounts. All payments during this time are subject to withholdings and deductions and are reported on a W-2. He is also subject to non-solicitation and non-competition clauses through ALFA Core. In the event of respondent's death or disability during ALFA Core, ALFA Core provides a survivor/total disability benefit.

¶ 24 Collectively, the ALFA Plus Transition Payment Award Agreement, ALFA Plus Commitment Agreement, and ALFA Core Agreement are hereinafter referred to as "the Agreements."

¶ 25 ii. Motion for Declaratory Judgment

¶ 26 On December 7, 2020, petitioner filed an amended petition for rule to show cause alleging, *inter alia*, that respondent failed to disclose his entry into the ALFA Program and to pay maintenance on the payments received. In response, respondent argued that the judgment did not require him to disclose his participation in the ALFA Program or pay maintenance on the funds received therefrom.

¶ 27 On September 7, 2021, respondent filed the operative motion for declaratory judgment, asking that the trial court find that

"the funds [respondent] receives via the UBS Aspiring Legacy Financial Advisor Program ("ALFA Program") are neither 'employment income' nor 'monies received by [respondent] *** for his performance ***' as defined by the Judgment for Dissolution of Marriage ***, but rather funds paid to him for his book of business; and, because Marsha already has received substantial maintenance and a disproportionate share of the marital estate, she is precluded from double-dipping and sharing in the proceeds from the book of business as well under Illinois law."

Respondent characterized his book of business as his personal goodwill and set forth two arguments: (1) petitioner's receipt of any portion of the ALFA payments/proceeds from the book of business would constitute an impermissible double dip since she already received a "substantial maintenance" award and a disproportionate share of the marital estate and (2) the ALFA payments were not "employment income" as defined by the judgment. In support of his motion, respondent

11

attached an affidavit of Brian Neville, an attorney who frequently represents financial advisors in employment transitions and has advised "hundreds of clients on how to monetize their book of business[.]" Neville's conclusions are discussed in further detail as part of his testimony below.

¶ 28    Petitioner filed her amended response, arguing that the ALFA payments do not represent the proceeds from the sale of a book of business; rather, they represent earned commissions from the client accounts and, therefore, are "employment income" subject to maintenance payments. Petitioner also raised the affirmative defenses of judicial estoppel, res judicata, collateral estoppel, and the law-of-the-case doctrine. Petitioner relied upon an affidavit of Scott Matasar, an attorney whose experience includes negotiating and drafting practice acquisition agreements for the sales of books of business. His conclusions are discussed in greater detail below within the discussion of his testimony.

¶ 29    On March 15, 2023, petitioner filed a motion *in limine* to bar Neville's testimony, arguing that the Agreements are unambiguous and, thus, extrinsic evidence to interpret or explain the same would be improper.

¶ 30    On March 20, 2023, the hearing on respondent's motion for declaratory judgment commenced. The trial court first addressed petitioner's motion *in limine*. The trial court denied the motion because it would be premature to exclude Neville's testimony as a whole. Instead, petitioner was invited to object to the relevance of specific testimony as it arose. The trial court distinguished this question from a breach of contract case where enforcement of the underlying contract was at issue and extrinsic evidence was inadmissible. This was not a contract dispute, but rather, a disagreement between respondent and petitioner, a non-party to the Agreements, over whether the monies provided to respondent under the Agreements constituted income for purposes of calculating maintenance.

12

¶ 31                                   a. Brian Neville

¶ 32        Respondent called Brian Neville as an expert witness. Among other work, Neville has

represented individuals contemplating entering the ALFA Program.

¶ 33        Neville testified that, apart from a financial advisor's regular compensation of fees and

commissions, they can earn additional monies if they transfer firms and bring their clients with

them. He described the process of financial advisors transitioning between firms as follows:

> "A. The successful financial advisor, so financial advisors who have accumulated
> what the industry calls a significant book of business, so that means their clients are
> frequently recruited by other firms to move from the first firm to the second firm, and that
> process is generally called transitioning ***."

Neville defined a book of business as follows:

> "A. The general concept of a book of business in the financial services industry is as
> a financial advisor you have loyal clients, and those clients would, typically follow you
> from one firm to the other. And that book of business is seen as yours because it does move
> with you. And that kind of concept is referred to frequently, in particular in the recruiting
> world of the industry.
>
>                                   * * *
>
> And it's really the revenue stream that is created by the assets under management
> that most people, I think, would call the book of business."

¶ 34        The transition between firms is often referred to as "monetizing" a book of business, which

generally cannot be done successfully until later in a financial advisor's career, after they have

established goodwill with their clients. He described the ETP term as the firms "renting or leasing

[a financial advisor's] book ***."

13

¶ 35          Neville explained that financial advisors can also sell their books of business *internally* at the firm as part of a retirement program like the ALFA Program. Programs like this were created to prevent financial advisors from selling their books of business to third parties upon retirement. Respondent "very easily" could have sold his book of business to a third party rather than entering the ALFA Program. Neville opined that UBS would not pay financial advisors "300 percent of their trailing 12" if UBS thought that they themselves controlled the client relationships.

¶ 36          Due to a regulatory rule that financial advisors cannot split fees or commissions with someone who is not a licensed financial advisor, the retiring financial advisor is required to remain registered since the ALFA Program pays a percentage of the fees generated from the book of business. The ALFA payments respondent receives for UBS's purchase of his book of business are "separate and distinct" from the regular fees and commissions he earned through his work as a financial advisor.

¶ 37          Neville's ultimate opinion is that the ALFA payments "are not compensation for [respondent's] ongoing efforts but are compensation for his sale of his book of business" and that it is "the sale of [respondent]'s personal goodwill because it was his book of business that he created over his whole career. Those clients were loyal to him." The "functional reality" is that the financial advisors control the relationship with clients, not UBS, because the financial advisors could sell their books of business elsewhere.

¶ 38                                    b. Wesley Tate

¶ 39          Respondent testified next. He stated that, as of August 2022, he was in the ALFA Core phase. Prior to ALFA Core, his daily duties included soliciting clients; servicing the book of existing clients; managing estate plans, tax issues, and client's family issues; and managing client assets. Per the transition, the book is now run by Wojtowicz, who also undertakes these day-to-

14

day tasks. The fees and commissions on respondent's earnings statements were "zeroed out" once he was in transition, as they were no longer attributed to him. Respondent was no longer required to contact clients, go into the office, or talk with Wojtowicz about the client accounts. At the time of the hearing, respondent no longer acted as a financial advisor at all.

¶ 40    Respondent characterized the monetization of his book of business as the firm purchasing the revenue stream from his book of business for a certain period of time (the duration of the ETP). Respondent testified that his book of business did not have any value between 2011 and 2019 (the term of the ETP with UBS) because he would have had to pay UBS back all the money that they paid him pursuant to the ETP, as the forgivable loans were subject to his continued employment. Nonetheless, he confirmed that he *could have* moved to a different firm during that time, it just would have been a zero-sum gain with the loan repayment.

¶ 41    At the time of the declaratory judgment hearing, respondent had received three of the four ALFA Plus payments, as well as some of the ALFA Core payments.

¶ 42                              c. Jane Eisland

¶ 43    Petitioner called Eisland, who testified "as the person most qualified *** to testify about the UBS Aspiring Legacy Financial Advisor Program and UBS financial advisor compensation." At the time of the hearing, her duties were to "educat[e] the financial advisors about the ALFA Program" by giving training and seminars on the ALFA Program. Eisland was instrumental in the development of the ALFA Program, as she was one of the people who led the design team.

¶ 44    Eisland was questioned about her Eisland article and specifically regarding her description of the ALFA Program as a reward for the business built by financial advisors. She explained, "We are rewarding them for the business that they have built." She described this phrasing as "colloquial terms" but provided the following answers on cross-examination:

15

"Q. Okay. I just want the record to be a little bit clearer. So when you use the term "business" there, you're referring to a book of business, correct?

A. Yes, that's what we call it.

\* \* \*

Q. \*\*\* And before business you used the term you, you're using that in a common way, right?

A. Yes.

Q. Okay. So you're—so when you use the term your, what you're saying is to the recipient of this message, the book of business it belongs to you, that's accurate, correct? \*\*\*

A. That you service, yes.

\* \* \*

Q. All right. The second sentence there says, It rewards you for the business you have built over the life of your career.

That's your—your writing, correct?

A. Yes.

Q. All right. And so when you say "you," you're talking to the recipient of this document, right?

A. Yes.

Q. Who is a financial advisor, correct?

A. Yes.

Q. And when you're talking—you use the term business, you're referring to book of business, correct?

16

A. Yes.

Q. And when you talk about built over the life of your career, so that refers back to the book of business, right?

A. Yes.

Q. Okay. And when you say the life of your career, you're referring to essentially the clients and the book that the financial advisor has accumulated in their career as a financial advisor; true?

A. Yes."

After this exchange, Eisland asserted that "book of business" means the accounts that a financial advisor is servicing, and that the accounts are owned by UBS. She later included the "past and hopefully future" stream of income generated from the client's assets within the definition of "book of business."

¶ 45 Respondent's counsel further pointed to the portion of the Eisland article that states, "Upon entering ALFA Core, you transition your book to a successful financial advisor." Eisland, again, stated that this refers to the book of business and that the financial advisor is "paid to transfer his book of business to another FA." Although Eisland stated that UBS does not purchase anything from the financial advisors through the ALFA Program, she agreed on cross-examination that the process entails "a financial advisor [being] paid money, transition[ing] his book of business to UBS, and then leav[ing] it there[.]"

¶ 46 Eisland testified that all monies paid under the ALFA Program are reflected in the recipient's W-2 earnings. However, she agreed that, upon entering the ALFA Program, there is the expectation that the financial advisor will officially separate from employment at UBS during ALFA Core. Because the monies received under ALFA Core will still be reflected on a W-2, even

17

after the financial advisor is no longer a UBS employee, Eisland agreed that the monies received in the ALFA Program have no connection to an individual's employment status.

¶ 47                                    d. Scott Matasar

¶ 48        Matasar testified as petitioner's expert witness. He acknowledged that he could not recall an instance where he represented a client who sought to enter the ALFA Program.

¶ 49        As part of his quest "to determine what the ALFA plan is and is not[,]" Matasar did not feel it necessary to interview respondent because his "subjective opinion" would not have been relevant to his analysis. Matasar arrived at his conclusion by looking at the ALFA Program documents and applying his specialized knowledge of the financial services industry.

¶ 50        Matasar concluded that the ALFA Program does not effectuate a sale of respondent's book of business because (1) the program documents do not use the terms "buy" or "sell"; (2) the monies are treated as W-2 wages; (3) UBS has the unilateral right to terminate the program; and (4) respondent's receipt of the monies is contingent upon his continued employment.

¶ 51        Matasar testified that the lack of the terms "buy" and "sell" was significant, and "[c]ontracts need to be reviewed and accepted on their face absent an ambiguity." Matasar found the ALFA payments' inclusion on respondent's paystubs and W-2 was indicia that this was not a buy/sell arrangement.

¶ 52        Matasar explained that the overall structure and operation of the ALFA Program show that it does not effectuate the sale of a book of business. The ALFA Program is imposed "by fiat" because UBS determines who can join based upon financial metrics and there is no negotiation over the payments received. The ALFA payments are also tied to employment, unless the financial advisor dies, becomes disabled, or is terminated without cause. UBS has "tremendous amounts of

18

latitude to determine a for cause termination which would then terminate the payments owed to [respondent]." "It makes the idea that this is a purchase or an acquisition of a book illusory."

¶ 53    Matasar concluded that respondent did not own his book of business and, therefore, could not have sold it. He stated that the clients that came with respondent to UBS from Morgan Stanley became UBS's clients. What respondent is being paid for pursuant to the ALFA Program is "using his best efforts to introduce a succeeding advisor and perform a warm handshake."

¶ 54                                    e. Ruling

¶ 55    On June 9, 2023, the trial court granted respondent's motion for declaratory judgment, finding that the ALFA payments did not constitute employment or investment income for maintenance purposes.

¶ 56    In reaching its decision, the trial court noted that Eisland's testimony was "extremely helpful, and determinative of what [respondent] is being paid for in this UBS program." Given Eisland's significant contribution to the development of the ALFA Program, she was able to testify to many of the documents designed by UBS to explain and advertise it. The trial court cited the various UBS documents that indicated the financial advisors were being rewarded for their business and paid to transfer it to a successor. The finding was further supported with the following evidence.

¶ 57    It was immaterial that the ALFA payments were shown on respondent's W-2, as Eisland confirmed that the payments lacked any connection to an individual's employment status. This is illustrated by the fact that while a UBS employee is in the inactive phase of ALFA Core, they are no longer considered an employee, yet they continue to receive ALFA payments that are reflected on their W-2. Likewise, while the ALFA payments are memorialized on an employee's paystub, they are reflected on a separate line item from the fees and commissions earned through the regular

19

work as a financial advisor. As such, an individual in the ALFA program receives two distinct streams of income: (1) compensation for the production generated by clients and (2) payments for the book of business.

¶ 58       The trial court was also unpersuaded by the argument that certain requirements imposed on an ALFA Program participant rendered the ALFA payments "employment income," as "a number of the requirements for both ALFA Plus and ALFA Core are regulatory in nature, and are required, but do not affect at least in this Court's mind what these moneys are for." Moreover, the fact that respondent was required to remain a full-time employee during the ALFA Plus phase was inconsequential to the analysis, as the retiring financial advisor and the field leaders had the discretion to determine the appropriate level of the retiring financial advisor's involvement in servicing the accounts to be transitioned.

¶ 59       While the trial court found Matasar to be a credible witness, he failed to establish the connection between the ALFA Program and respondent's employment activities necessary to support a finding that the ALFA payments are employment income.

¶ 60       The experts agreed that neither respondent nor UBS owned the clients *per se*; however, the "functional reality" is that UBS, through the ALFA Program, seeks to capitalize on the relationships created and maintained by respondent, not by UBS, and keep the clients with UBS after respondent's departure. This is further supported by respondent's track record of success in bringing clients with him from one firm to another. "This speaks to the depth of the relationship between [respondent] and his clients for his trusted advice, and it is this which UBS is paying for." If UBS owned the client relationships, there would be no need to pay the retiring financial advisors to transition the clients to UBS.

20

¶ 61 The trial court emphasized that respondent does not necessarily have to be employed to receive the ALFA payments. The entry into ALFA Core, which contemplates that respondent will eventually no longer be a UBS employee, was a requirement of the ALFA Program. Moreover, the ALFA payments were still payable to respondent or his estate in the event of his death or total disability, albeit in a discounted and accelerated manner, despite that he would no longer be a UBS employee under these scenarios. Conversely, the commissions and fees respondent received by virtue of his employment as a financial advisor would cease upon his death.

¶ 62 In granting the motion for declaratory judgment, the trial court further found that the possibility of respondent monetizing his book of business was considered by the pre-decree trial court and contemplated in the judgment. During the pre-decree trial, petitioner's counsel reminded the court that the value of respondent's book of business spoke to the parties' abilities to acquire capital in the future. Thus, the trial court reasoned, "It is clear the parties thought this might happen, and [petitioner] was compensated for this possibility by receiving a disproportionate division of the marital estate." Accordingly, for petitioner to now receive a portion of the ALFA payments as maintenance would represent a double dip.

¶ 63 Petitioner timely appealed.

¶ 64 II. ANALYSIS

¶ 65 On appeal, petitioner argues the ALFA payments constitute "employment income" pursuant to the judgment and are thus subject to maintenance, a conclusion she contends inextricably follows from the legal interpretation of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/504 (West 2016)), the judgment, and the Agreements. Specifically, petitioner argues that (1) the ALFA payments are "income" under the Act; (2) the plain language of the judgment illustrates that the pre-decree trial court contemplated a broad

21

definition of "employment income" from which respondent was to pay maintenance; (3) the plain language of the Agreements reinforces the inclusion of ALFA payments in maintenance income; and (4) the trial court erred in relying upon extrinsic evidence to interpret the Agreements. Petitioner also argues that the trial court's finding that petitioner would receive a double dip if she shared in the ALFA payments misinterpreted the judgment and misapplied case law pertaining to personal goodwill. Lastly, petitioner contends that several equitable legal doctrines prevent respondent from claiming to own a book of business for the first time years after the judgment was entered. For the reasons that follow, we affirm the trial court's judgment.

¶ 66                                    A. Standard of Review

¶ 67        As an initial matter, we note that the parties disagree as to the applicable standard of review. Petitioner contends that *de novo* review is appropriate and that the issues presented are purely legal in nature, whereas respondent urges that the trial court's ruling should be reviewed for an abuse of discretion because the trial court made factual determinations as to whether ALFA payments constitute "employment income" after an evidentiary hearing.

¶ 68        The appropriate standard of review for a motion for declaratory judgment is entirely "depend[ent] upon the nature of the circuit court proceeding." *Oak Run Property Owners Ass'n, Inc. v. Basta*, 2019 IL App (3d) 180687, ¶ 50. In recognition of the "special competence" of the trial court in making factual determinations, "[w]hen we are reviewing a type of decision that the trial court was better qualified to make, we must proceed with due recognition of the trial court's superior vantage point." *In re Marriage of Rife*, 376 Ill. App. 3d 1050, 1058-59 (2007). Decisions to which we must exercise great deference include assessments of witness credibility and the weight to assign conflicting evidence. *Pekin Insurance Co. v. Hallmark Homes L.L.C.*, 392 Ill. App. 3d 589, 593 (2009) (citing *Rife*, 376 Ill. App. 3d at 1058-59). On the other hand, where no

22

factual determinations are made and the issues presented are purely legal in nature, a trial court's judgment is reviewed *de novo*. *Pekin Insurance Co.*, 392 Ill. App. at 593.

¶ 69   As discussed in more detail below, petitioner's characterization of the issues as nothing more than the interpretation of the Agreements, judgment, and the Act misconstrues the declaratory judgment proceedings as a whole and disregards nearly all of the evidence presented therein. The sole issue at the center of this case is whether the ALFA payments constitute "employment income," which is a factual question that required the trial court to assess witness credibility and weigh various conflicting testimony. Indeed, the trial court conducted an evidentiary hearing and heard expert testimony from *both* parties. As such, we review the trial court's ruling with deference and against the manifest weight of the evidence.[2] *Petersen v. Petersen*, 58 Ill. App. 3d 272, 275 (1978) ("The findings of a divorce court are generally presumed to be correct and a reviewing court will not set aside the trial court's findings unless they are clearly against the manifest weight of the evidence."). "A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence." *Judgment Services Corp. v. Sullivan*, 321 Ill. App. 3d 151, 154 (2001). The manifest weight of the evidence standard of review affords the trial court great deference, as it "is in a superior position to determine and weigh the credibility of witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Wade v. Stewart Title Guarantee Co.*, 2017 IL App (1st) 161765, ¶ 59.

¶ 70   B. Trial Court's Consideration of "Extrinsic Evidence"

---

[2] Factual determinations in a declaratory judgment proceeding have also been reviewed for an abuse of discretion. *Oak Run Property Owners Ass'n, Inc.*, 2019 IL App (3d) 180687, ¶ 50. Nonetheless, under either standard, our analysis remains unchanged.

¶ 71 As an initial matter, petitioner argues that the trial court erroneously considered what she characterizes as "extrinsic evidence" in making its determination. According to her theory, the Agreements unambiguously set forth the terms of respondent's participation in the ALFA Program and therefore are the sole evidence to be considered when resolving the question of whether the ALFA payments constitute "employment income." Petitioner contends that the four corners rule applies and the use of extrinsic evidence to contradict or supplement the terms of the Agreement is improper. The four corners rule is a contract interpretation principle. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462 (1999). "If the language of the contract is facially unambiguous, then the contract is interpreted by the trial court as a matter of law without the use of parol evidence." *Id.* We address this argument first, as the purported extrinsic evidence serves as the backdrop for this case.

¶ 72 Petitioner's reliance on the four corners rule to render inadmissible the testimony at issue is unavailing. The determinative issue here, whether the payments were in exchange for employment performance, is not a matter of contract construction and, therefore, the Agreements cannot be considered in isolation. This fact was noted by the pre-decree trial court in its denial of petitioner's motion *in limine* regarding Neville's testimony. Indeed, the evidence to which petitioner objects is not extrinsic evidence at all. It was not offered or considered to interpret the terms of the Agreements. It was presented, instead, to provide context as to the purpose of the ALFA payments, *i.e.*, whether they represent proceeds from the sale of respondent's book of business as opposed to for respondent's employment performance.

¶ 73 For these reasons, the trial court properly considered evidence beyond the Agreements.

¶ 74 C. Employment Income vs. Sale of Book of Business

24

¶ 75    We next turn to the dispositive issue—whether the trial court's finding that the ALFA payments are not "employment income" and, instead, represent the proceeds from respondent's sale of his book of business, was against the manifest weight of the evidence. In support, petitioner focuses primarily on language from the Agreements to support her argument that the ALFA payments, as a matter of law, constitute "employment income" rather than the proceeds from the sale of respondent's book of business.

¶ 76    Specifically, petitioner points to the Agreement language demonstrating that the ALFA payments are "employment income" because they are tied to respondent's employment with UBS. While there is certainly language in the Agreements that, in isolation, might support petitioner's theory, it remains the case that the Agreements were drafted to set forth UBS's and respondent's legal rights and obligations, and not to explain the purpose of the ALFA Program as a whole or how monies advanced under the ALFA Program should be characterized for purposes of deciding maintenance.

¶ 77    In a similar vein, petitioner asserts that the W-2 reporting status of the ALFA payments conclusively shows that they are "employment income." Respondent counters with *In re Marriage of Rogers*, 213 Ill. 2d 129, 137 (2004), and *In re Marriage of McGowan*, 265 Ill. App. 3d 976, 979 (1994), for the proposition that income for taxation can be defined differently than income for support, as the two calculations serve distinct purposes. *Cf., McGowan*, 265 Ill. App. 3d at 979; *Rogers*, 213 Ill. 2d at 137 ("[T]he Internal Revenue Code is designed to achieve different purposes than our state's child support provisions."). Similarly, UBS's and the Internal Revenue Code's designation of the ALFA payments as W-2 wages for taxation purposes is not determinative of whether it constitutes "employment income" for the maintenance calculation under the judgment. As Eisland confirmed, the financial advisor is "paid to transfer his book of business to another FA"

25

and that the process entails "a financial advisor [being] paid money, transition[ing] his book of business to UBS, and then leav[ing] it there[.]" This is reflected in the trial court's finding that respondent sold his book of business pursuant to the ALFA Program.

¶ 78    Petitioner also sets forth numerous arguments parsing the words of the Act and the judgment to support her position that the ALFA payments constitute "employment income." These arguments, again, misconstrue the issue on appeal; determining the nature of the ALFA payments does not require any statutory construction or interpretation of the judgment to decide the *factual* question of whether the ALFA payments represent the purchase price for respondent's book of business.

¶ 79    Petitioner's brief otherwise largely ignores the documentary and testimonial evidence elicited at the declaratory judgment hearing. Despite the extensive documentary evidence presented by both parties, she fails to meaningfully address any documents other than the judgment and the Agreements. The crux of her argument is essentially that all evidence aside from the Agreements and the judgment should be ignored completely, and she does not offer an alternative analysis in the event we do not accept her theory. Nor does petitioner adequately address Eisland's testimony as one of the creators of the ALFA Program, which the trial court relied upon in rendering its decision. Indeed, petitioner has failed to make any attempt to refute or otherwise challenge the trial court's reliance on the overwhelming evidence that the ALFA Program effectuates the sale of respondent's book of business. Certainly, petitioner does not develop any argument that the trial court assigned improper weight to or misunderstood the evidence, credited any witnesses improperly, or that the decision was unreasonable or unsupported by the evidence. See *Judgment Services Corp.*, 321 Ill. App. 3d at 154.

26

¶ 80 To the contrary, the record demonstrates a thoughtful and detailed ruling, specifically addressing the credibility of the witnesses, the documents received, and the weight assigned to certain conflicting evidence. See *supra* ¶¶ 54-62. Petitioner has not argued that the trial court's assessment of this evidence was erroneous, but rather that it should not have been considered in the first place. Having determined that the evidence was properly considered, we cannot say that the trial court's conclusion that the ALFA payments were for respondent's sale of his book of business was against the manifest weight of the evidence.[3]

¶ 81                                D. Equitable Defenses

¶ 82 Finally, petitioner asserts multiple equitable defenses—judicial estoppel, law-of-the-case doctrine, collateral estoppel, and res judicata—to argue that respondent cannot be awarded the relief he seeks in his motion for declaratory judgment. Respondent contends that petitioner did not develop her arguments as to the latter three and, therefore, forfeited the same. We agree that petitioner failed to develop her arguments as to the law-of-the-case doctrine, collateral estoppel, and res judicata beyond merely defining the doctrines. As such, these arguments are forfeited. *Bartlow v. Costigan*, 2014 IL 115152, ¶ 52 (holding that issues raised in a cursory fashion are forfeited).

---

[3] To the extent our book of business determination is dispositive, we need not address petitioner's arguments that the trial court's goodwill and double dipping analyses were in error. Because we do not reach the issue of double dipping, it is also unnecessary to address petitioner's argument likening the speculative nature of the ALFA payments to contingent fee contracts. See *In re Marriage of Zells*, 143 Ill. 2d 251, 252-53 (1991) (holding that an attorney's receipt of contingent fees should not be considered a marital asset and, instead, the appropriate context for their consideration "is in the determination of income for *** maintenance.").

¶ 83        Petitioner relies upon respondent's trial testimony regarding the ALFA Program to support her assertion of judicial estoppel. A party asserting judicial estoppel must show that the party to be estopped "(1) [took] two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it." *Seymour v. Collins*, 2015 IL 118432, ¶ 37. Here, respondent did not take factually inconsistent positions, and the defense fails under the first and second elements. Respondent did not deny the existence of ALFA or his eligibility to participate in the same. He merely gave his subjective opinion as to the quality of the program, and the pre-decree trial court otherwise received an objective overview as to what the ALFA Program entails from both Christensen and the 2016 financial advisor compensation plan. As observed by petitioner's expert, respondent's opinion of the ALFA Program is not determinative of whether it provides income for maintenance purposes.

¶ 84                                    III. CONCLUSION

¶ 85        For the reasons stated herein, we affirm the judgment of the circuit court of Du Page County.

¶ 86        Affirmed.