**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2024 IL App (3d) 230661-U

Order filed December 30, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2024

| | | |
|---|---|---|
| TONY JEFFREY and MICHELLE JEFFREY, | ) | Appeal from the Circuit Court |
| | ) | of the 12th Judicial Circuit, |
| Plaintiffs-Appellants, | ) | Will County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-23-0661 |
| | ) | Circuit No. 19-CH-1467 |
| | ) | |
| WILDGRASS HOMEOWNER'S | ) | Honorable |
| ASSOCIATION, INC., an Illinois Not for Profit | ) | Barbara N. Petrungaro, |
| Corporation, and the BOARD OF DIRECTORS | ) | Judge, Presiding. |
| OF WILDGRASS HOMEOWNER'S | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

_____

JUSTICE ALBRECHT delivered the judgment of the court.
Justice Hettel concurred in the judgment.[1]
Justice Holdridge specially concurred.

_____

[1]Although Justice Hettel participated in this appeal, his judicial appointment ended prior to the filing of this order. Our supreme court has held that the departure of a judge prior to the filing date will not affect the validity of a decision so long as the remaining two judges concur. *Proctor v. Upjohn Co.*, 175 Ill. 2d 394, 396 (1997).

**ORDER**

¶ 1    *Held*:    The circuit court's finding that plaintiffs failed their burden to prove the overland flowage easement had not been completed was not against the manifest weight of the evidence. Based on the plain language of the subdivision's declaration and plat, the circuit court did not err in holding that plaintiffs are responsible for maintaining the easement. Affirmed.

¶ 2    This case concerns the creation and maintenance of an overland flowage easement that spans the length of two lots situated in the Wildgrass subdivision planned unit development in Monee, Illinois, an unincorporated area of Will County. The plaintiffs, Tony and Michelle Jeffrey, own both lots and brought suit against Wildgrass Homeowner's Association, Inc. (Association) and the Board of Directors of Wildgrass Homeowner's Association (Board), claiming the Association subsumed the responsibility of creating and maintaining the easement but have failed on both fronts. Following a bench trial, the court ruled in favor of the Association and Board and alternatively held that the doctrine of *laches* barred the Jeffreys' claim. The Jeffreys appeal from this ruling. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On October 4, 2019, the Jeffreys brought a two-count complaint against the Association and Board, claiming nuisance resulting from the excess of stormwater that accumulates between their two properties and seeking a permanent injunction for the Association to remove the vegetation buildup in the overland flowage easement, to install a swale to create appropriate drainage, and to maintain the easement thereafter. The Jeffreys filed an amended complaint on January 27, 2022.

¶ 5    According to the amended complaint, the Jeffreys first purchased one of the lots situated in the subdivision in 2004 and constructed a single-family home on the lot the following year. In 2018, they purchased the lot immediately north of their property. The pleading alleged that in

2

December 2003, the subdivision's developer adopted a declaration of covenants, conditions, restrictions, reservations, equitable servitudes, grants, and easements.

¶ 6         For the enforcement of these provisions, the declaration created the Association, which was obligated "in perpetuity, to maintain the Common Areas, whether said Areas are located on private property or in public rights-of-way; all in accordance with the approved plans." In 2006, the developer turned the Association over to the members of the subdivision.

¶ 7         The design of the subdivision, according to the plat, provided for a 20-foot public utility and overland flowage easement, essentially a drainage ditch, with 10 feet of the easement straddling the Jeffreys' properties and running the extent of the lots' shared boundary. The complaint alleged that the developer was required to and failed to install a swale through excavation and grading pursuant to the subdivision plans. Therefore, per the complaint, it was the responsibility of the Association to complete this swale, but the Association continually refused to do so despite the Jeffreys' requests.

¶ 8         The Jeffreys claim that the declaration, the plat, and local ordinance bind the Association to complete the construction of the swale. Article IV, section 10 of the declaration provides that, in the event the Association ceases operation, "ownership of storm water management facilities *** shall be transferred to a public agency willing to accept the areas, or shall revert to the Owners of the Lots created by the subdivision."

¶ 9         The plat provides that

> "[e]ach owner or subsequent purchaser shall be equally responsible for
> maintaining the overland flowage easement and shall not destroy or modify
> grades or slopes without having first received prior written approval of the

township of Green Garden/the County of Will, or any other unit of Local government having jurisdiction over drainage."

¶ 10 The complaint alleges that the Association's failure to create the swale and maintain the overland flowage easement has resulted in vegetation growth that prevents proper drainage and as consequence, standing water threatens the Jeffreys' septic system, kills trees, produces noxious smells, and attracts mosquitos.

¶ 11 On February 8, 2022, the Association and Board filed their answer to the Jeffreys' amended complaint. The defendants denied an obligation to create or maintain the Jeffreys' easement and asserted several affirmative defenses. They argued that the Jeffreys were barred from recovery due to their failure to comply with the declaration's requirement that owners maintain their property. Separately, they argued the doctrine of *laches* applied to bar the Jeffreys' claim for their failure to timely bring suit concerning the condition of the swale.

¶ 12 The parties filed cross-motions for summary judgment, which the court denied on August 8, 2022, after finding the existence of issues of material fact. Subsequently, the parties agreed to bifurcate the trial, first for the court's factual determination of whether the overland flowage easement had been completed, and if not, whether the Association had the obligation to install it. The trial would also determine whether the Association had the legal duty to maintain the easement. Thereafter, the parties would proceed to a jury trial on the Jeffreys' nuisance claim.

¶ 13 A two-day bench trial began on March 28, 2023, with six witnesses testifying: Michael Gingerich, a named partner of the engineering company M. Gingerich, Gereaux & Associates known as MG2A (MG2A); the Jeffreys; Scott Killinger, the former chief subdivision engineer for Will County; Robert Hartman, a Wildgrass subdivision resident; and John Slager, one of Wildgrass subdivision's developers through the corporate entity Slager-Tieman, Inc. (Slager-

Tieman). The parties also introduced Fred Bartuch's evidence deposition into the record as the former property owner of lot two in the Wildgrass subdivision.

¶ 14        The parties provided the court with a joint statement of uncontested facts establishing that the subdivision was originally owned and developed by Slager-Tieman which adopted and recorded a declaration of covenants, conditions, and restrictions in December 2003. The Association was incorporated by Slager-Tieman in 2004, and in 2006 the developer turned over the Association to the owners of the subdivision. Since this turnover, the Association has been governed by a board of directors elected by lot owners. The Board is responsible for the management and day-to-day operations of the Association and owes a fiduciary duty to the subdivision's lot owners. The subdivision remains subject to the covenants and conditions set out in the declaration, and the Association is bound by the declaration.

¶ 15        Gingerich testified that in the early 2000s the Wildgrass subdivision's developer, Slager-Tieman, retained his company to provide civil engineering and land surveying services. His firm also designs and provides calculations for storm water management, primarily for storm sewers and overland drainage for facilities or subdivisions.

¶ 16        Gingerich's firm began by surveying the land that later became Wildgrass subdivision. It then created documents, including a plat of subdivision and engineering plans, which offered direction for development. The engineering plans are drawings of the subdivision that listed the existing elevations and the proposed final grades of the surveyed land. The plat of subdivision, which was prepared by MG2A's surveyor, depicted lot dimensions, easement locations, and rights-of-way. The engineering plans prepared and tendered for the subdivision included facilities for storm water management. According to Gingerich, the general purpose of the

overland flowage easement "is to preserve a path over land for storm water runoff." The grades in the easement area were established during construction of the subdivision.

¶ 17    Along with the other easements in the subdivision, the engineering plans defined the contours of the overland flowage easement between lots two and three—the land the Jeffreys would come to own. The easement is 20 feet wide in total, with 10 feet straddling both lots, and runs the length of the lots. According to Gingerich, if the easement's contours depicted in the engineering plans went unheeded during construction, "water wouldn't flow as intended."

¶ 18    Gingerich's firm also prepared a rendering for erosion control measures that included the strategic placement of hay bales, a ditch, and a silt fence in efforts to reduce sediment from invading the overland flowage easement. Completing the overland flowage easement involves grading the easement and establishing vegetation. Once the vegetation takes and the area "is stabilized," these temporary measures for sediment reduction may be removed.

¶ 19    Gingerich agreed that in order to permit storm water flowage, the developer was required to meet the contours in grading provided by Gingerich's firm. There was a natural slope over the easement area of roughly five feet to begin with. Gingerich agreed that five feet of natural gradation was sufficient to move the flow of water. The reason for the easement, according to Gingerich, was to rechannel the flow of water into the easement.

¶ 20    While Gingerich testified that the contours his firm provided were mandatory, he did not know whether Slager-Tieman constructed the overland flowage easement. Gingerich testified he made periodic visits to the site and if he saw that part of the construction did not comply with his firm's drafts, he would inform the developer. He did not recall telling the developer it was noncompliant here.

¶ 21　　　　Later, MG2A also created a site plan and "as-built" drawings for the Jeffreys' home construction. The purpose of the proposed site plan for the Jeffreys' home was to "establish[ ] what the proposed grades and the location of the home and the driveway are," which the county requires for every new home construction. An "as-built" drawing reflects certain property dimensions following construction. According to Gingerich, Will County wants the "as-built" drawing to "demonstrate that the key drainage features of the project were achieved" and "to show" in this instance that the "overland flow path between lots two and three" and "the storm water detention [were] *** in general conformance with the plan."

¶ 22　　　　Tony Jeffrey testified that he, his wife, and their three children reside at their home in the Wildgrass subdivision and that he has lived there since March 2005. He described the subdivision as a gated community with a u-shaped road that leads from one gate to another. When he purchased his lot in August 2004, the subdivision was "raw," with no gates, spools of powerlines on the street, and only one unoccupied speculative house. Prior to purchasing lot three, Tony noticed no excavation on the property other than a swale running parallel to the road.[2] Similarly, Tony noticed that the developer did not excavate lot two, and only the topsoil was taken off.

¶ 23　　　　In September 2004, when he started to construct his home, there still had not been excavation to either lot. Around this time, the foreman set to lay the concrete foundation for Tony's home, John Redmond, informed him that there was "approximately three or four feet of water" where the foundation was to be laid that seemed to be coming from the culvert pipe running underneath the street. Tony called Slager about the issue and Slager responded that there

_____

[2]Tony later described this region as a "30-foot waste management storm water facility" designed to "ferr[y]" water into the overland flowage easement.

7

was supposed to be an overland flowage easement installed between lots two and three, but "that he hadn't gotten around to doing it." Slager then asked whether those laying the foundation had equipment that could divert water away from the foundation and towards the back of the property. Tony then contacted Redmond who agreed to pump the water out of the foundation and, with a skid steer, created a pathway to stop the water from flowing into the foundation. Upon Tony's return to the property later that day, he saw the "crude trench" created to redirect water away from the building site that was "very close to the lot line of two and three" and extended from the eastern portion of the lot to "approximately 30 feet in on [his] property" up to a silt fence erected by the developer.[3]

¶ 24        This "temporary trench" worked until the following spring, when rainwater began to pool near the silt fence and invade the lot. He contacted Redmond again to retread the trench. This process proved cyclical—months would elapse before the area eroded and flooding issues returned, Tony would call Redmond who would then retread "a very similar path" and cleanup the makeshift trench. With each cycle, the water began to encroach closer and closer to the Jeffreys' home and their septic field. As Tony explained, "every six-month period we would notice the rear of our property getting wetter and soggier and obviously getting closer to our septic field which is – you know, your septic fold gets contaminated with water, you can't live in your house." Sometime in 2005, Tony had a landscape wall constructed within the easement on lot three. During the fourth retreading, in 2006, Tony instructed Redmond to make a hole in the silt fence which worked "incredibly well" and resulted in fewer instances of backups giving reprieve from the flooding issues for "maybe four years."

---

[3]On cross examination, Tony stated that "[t]here was never a silt fence between lot two and three ever" but later answered affirmatively when asked if he was referring to the "silt fence in the overland flow easement, *** where it crosses in between [lots] two and three."

¶ 25      Tony served on the Board in 2006, near the time that the developers turned over the Association to the members of Wildgrass subdivision. According to Tony, he informed the Association of his property's flowage issue at the first Association meeting in late summer 2006.[4] When the trench had standing water in late 2008 or early 2009, after Tony was no longer on the Board, he again approached an Association member who instructed Tony to elicit an estimate from a landscaping company to install the overland flowage easement. In early 2010, Tony received an estimate from Fawn Landscaping and provided it to the requesting member. Tony sent a letter requesting to meet with the Board which went unanswered. He retained counsel who sent correspondences in February and March 2011 that warned if the "storm water drainage issue" was not remedied before May 11, 2011, the attorney will have "no further option but to exercise any and all legal and equitable remedies at [Tony's] disposal." The Association's attorney responded by threatening to place a lien on the Jeffreys' property for purported breach of covenants. Letters sent by Tony's attorney afterwards went without reply.

¶ 26      In 2012, the Board was ousted, and according to Tony, the new president, Chris Tooley, stated his first priority was to "fix[ ]" the Jeffreys' drainage woes. Tony also temporarily reassumed a role on the Board. At some point, Tooley visited the Jeffreys' property to assess the easement's gradation. In July and August 2017, Tooley texted Tony stating "I have not forgotten about the storm water drainage. I am going to make another attempt at this again, but I am in the minority opinion in my vote" and later texted, "[i]t has been discussed and are [*sic*] ongoing." In November, Tony's attorney sent a letter to Tooley but again did not receive a reply.

---

[4]The minutes from the July 27, 2006, meeting and agendas from the August 9, 2006, and December 5, 2006, meetings do not corroborate Tony's assertion that the easement was discussed.

9

¶ 27 　　　　The Jeffreys purchased lot two in 2018 or 2019. The easement area has continued to deteriorate. Vegetation grows and decays which inhibits the flowage of water. The standing water in the easement attracts mosquitos, the amount of which Tony has described as "a biblical plague." According to his testimony, Will County has tested the mosquito larvae, and they contain the West Nile virus. The Jeffreys do not allow their children to "play out in [their] rear yard for certain periods" of the year because of this.

¶ 28 　　　　During cross examination, Tony testified that he believed the overland flowage easement was never constructed and he was aware of this defect since purchasing the land in 2004. Tony seeded half of the easement on lot three when he moved in. Other than cutting the resulting grass, he did not maintain any area of the easement. Tony began researching the easement in 2008 or 2009, which included the first time he read the plat of subdivision. In either 2009 or 2010, he removed the silt fencing from lot three. Tony testified that the delay in filing his lawsuit was multifaceted. Despite his attorney's threat to file a lawsuit in 2011, Tony delayed because Tooley "asked [him] not to file a lawsuit because [Tooley] wanted to wait until his house had sold before he moved out of the subdivision." Further, Tony did not want to add to the turmoil of the neighborhood and did not want to sue his neighbors. Finally, Tooley's assurance that the Jeffreys' issue was his "number one priority" served as an additional deterrent. On this topic, Michelle supplementally testified "they're neighbors," that "[w]e have to live here," and "we really didn't want to" file suit. Although she had memory lapses concerning the time when she and Tony bought the lot, she testified that when walking the property prior to purchase, she did not notice any swale or ditch.

¶ 29 　　　　Killinger served as Will County's chief subdivision engineer from 2017 to 2023. He testified that the chief subdivision engineer's responsibilities include reviewing the engineering

10

plans to ensure code compliance and reviewing the plat to ensure compliance with the Plat Act (765 ILCS 205/0.01 *et seq.* (West 2022)) prior to submitting the proposal to the county board's planned use committee. However, he could not testify as to the procedures in place prior to his tenure. Per Killinger, an " '[a]s-built' shows the conditions at the time that the subdivision is complete *** [and is] a prerequisite to releasing the surety, the letter of credit."

¶ 30       Hartman purchased his lot in the Wildgrass subdivision in 2004 and moved into his home in 2006. In 2004, he observed a swale or ditch in between lots two and three. He began as treasurer of the Board around 2009 and served on the Board for approximately three or four years. Hartman passes the Jeffreys' property about "20 [to] 30 times" a month and has done so since 2006. There has been an "immense[ ]" change in the overland flowage easement area including the caving in of the landscape wall Tony had erected and the growing of cattails and trees in the easement that have contributed to standing water and drainage issues.

¶ 31       In either 2009 or 2010, Tony approached the Board to discuss the water flowage issues. In response, the Board requested the property's site plan, but Tony relayed that he did not have it. Hartman contacted Will County who then provided him with the Jeffreys' site plan. Thereafter, he approached Tony to explain his landscape wall had been improperly constructed, but Tony responded that the Association should bear the cost. The Board took no further action concerning the overland flowage easement after this encounter. Hartman did not recall seeing the Fawn Landscaping estimate.

¶ 32       Slager testified that he began developing properties in 1990 and between that time and 2007, he developed eight to ten subdivisions. His role in the Wildgrass subdivision development was "[o]verseeing construction [and] initiating land purchases." Slager-Tieman purchased the property, which was approximately 250 acres, in 2003. Slager usually disposes of his records

11

every seven years and by the time of trial had discarded the Wildgrass subdivision development records. He recalled that the earth work required for this property included mass grading—the process of grading the ground, removing the topsoil, and creating "drainage ditches and overflow drainage all based on the plan that the engineer has drawn, and the county has approved." Slager described a set process of completing earth work, planting vegetation where necessary, having inspections, requesting letters of credit following specific inspections, and when finished "call[ing] for a complete release of the letter of credit, and they send an inspector out to make sure everything is complete and as well as our engineer does an as-built drawing showing that, what condition the property is in when we're done." In April 2006, the Will County Land Use Department sent a letter cancelling the original letter of credit. The letter, signed by the chief subdivision engineer, stated "[t]he subdivision has been inspected and the improvements seem to be in substantial conformance with the approved plans and specifications." Slager testified that the overland flowage easement was completed by the time he received the letter. In February 2008, the Will County Land Use Department sent another letter that Slager called the "final letter of credit" which released any further financial obligation.

¶ 33    Slager testified to overseeing the excavation of the overland flowage easement and was present during its creation. He answered affirmatively that a swale was created and vegetation was planted in the overland flowage easement between lots two and three which was then "inspected and completed." The time it takes to create an overland flowage easement is "[o]ne year at most." He testified that once vegetation in the easement is established, the silt fence should be removed, and it was standard procedure for the developer to maintain the easement. He could not testify whether the Jeffreys' overland flowage easement was maintained. He did not recall instructing Tony to utilize a skid steer through the easement for flowage.

12

¶ 34    On May 17, 2023, the court entered a written order ruling in favor of the Association and Board. It found that the circumstantial evidence lent credence that the overland flowage easement was completed. It found Slager credible, and his testimony contradicted the Jeffreys' contention that the swale was not installed. Further, the release of the letters of credit supported that substantial conformance with the county's approved plans was accomplished. It determined that there was "no credible evidence that the improvements were not complete, and that Will County failed to ascertain compliance by the developer with the plans by 2008."

¶ 35    It also found that the record did not corroborate Tony's contention that he brought the flooding issue to the Board's attention during his first term on the Board, nor is there indication that he brought up the issue during his second brief term on the Board in 2011. Rather, the court noted, Tony took matters into his own hands by retaining excavation services for the trench.

¶ 36    Next, the court held that it was the obligation of the lot owners to maintain their own lots, as indicated by the covenants. It ruled that the Jeffreys failed their burden of proof to establish a mandatory injunction to compel the Association to install and maintain the overland flowage easement.

¶ 37    Alternatively, the court held that the Association and Board met their burden of proof to show *laches* barred the Jeffreys' claim, noting Tony and Michelle both admitted to knowing a swale had not been installed as early as 2004, Tony failed to act despite the overland flowage easement's worsening condition, and the delay resulted in the loss of records and muddled memories. "[T]he evidence is undisputed" the court found "that the Plaintiffs failed to exercise due diligence to bring this suit" and that "there is ample evidence of delay serving to prejudice the Defendants."

13

¶ 38    The Jeffreys received an extension to file a post-trial motion and moved to vacate the judgment with an accompanying memorandum on July 13, 2023. After briefing, the court heard arguments and, in an October 19, 2023, written order, denied the Jeffreys' post-trial motion. It wrote "the Court believes that the evidence establishes that the swale was installed and that the documents required the owner, here the Plaintiff[s], to maintain said swale. In the alternative, laches applies. Memories fade, documents are lost, which did prejudice the parties in this case."

¶ 39    The Jeffreys now appeal.

¶ 40                                II. ANALYSIS

¶ 41    On appeal, the Jeffreys assert that the court's factual finding that the overland flowage easement was created and that the Jeffreys failed to prove otherwise is against the manifest weight of the evidence. They also challenge the court's holding that, as the lot owners, they were obligated to maintain the overland flowage easement, arguing that the Association is bound to this responsibility by the subdivision's declaration and plat. Last, they argue the court was wrong to find their suit barred based upon the affirmative defense of *laches*.

¶ 42                    A. The Overland Flowage Easement's Creation

¶ 43    Following a bench trial, the circuit court determined that based on the circumstantial evidence, the Jeffreys failed to meet their burden of proving the overland flowage easement was not created. The standard of review for a circuit court's decision " 'following a bench trial is to determine if the judgment is based on facts that are against the manifest weight of the evidence.' " *Cincinnati Insurance Co. v. Pritchett*, 2018 IL App (3d) 170577, ¶ 16 (quoting *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59). "A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of the*

14

*City of Chicago*, 224 Ill. 2d 530, 544 (2007). This standard "affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony." *Wade*, 2017 IL App (1st) 161765, ¶ 59.

¶ 44    The Jeffreys challenge Slager's testimony, which the court heavily relied upon in its ruling. They argue that Slager could provide few specifics regarding the easement; he could not testify with specificity as to when the easement was created, did not know who planted the vegetation, and could not account for the silt fence remaining on the Jeffreys' property long after the easement's supposed completion. Slager's shortcomings in memory can hardly be cast as unordinary. At the time of trial, it had been nearly 20 years since Slager-Tieman purchased the property and began its groundwork. In conflict with the Jeffreys' appellate contention that Slager was testifying merely on typical practices, as opposed to his recollection of the specific swale at issue, Slager was explicitly questioned about the easement resting between lots two and three and answered affirmatively that a swale was created and vegetated. While Slager answered affirmatively to the question "[s]o your testimony here today is based upon your memory *** of the events that occurred 19 years ago?" he clarified that he was present during the creation of the overland flowage easement and was there daily during its construction. To the extent the Jeffreys seek a reevaluation of Slager's credibility, we refuse to do so. *Jameson v. Williams*, 2020 IL App (3d) 200048, ¶ 51 ("It is well settled that a reviewing court's function is not to reweigh the evidence or assess witness credibility and set aside the circuit court's decision simply because a different conclusion may have been drawn from the evidence.").

¶ 45    The Jeffreys next argue that the photographic evidence of their backyard and the presence of the silt fence, a fence which Tony removed in 2009 or 2010, offer compelling unrebutted

15

proof that the overland flowage easement was not completed. As the circuit court correctly noted, the circumstantial evidence of the original letter of credit's cancellation and the release of the final letter of credit indicates that the improvements were in substantial compliance with the engineering schematics. The Jeffreys argue that because no record of inspection was contained within the county records, we may draw the inference that no inspection was accomplished. This does not *affirmatively* disprove that an inspection was done, nor does it address that the release of the letters of credit offer evidentiary support to the overland flowage easement's completion. On balance, the record contains numerous circumstantial indicia that the easement was completed—including Slager's testimony about the swale creation, the release of the letters of credit, and Hartman's testimony identifying the swale in 2004. It was not against the manifest weight of the evidence for the court to find that the Jeffreys failed their burden of proving the overland flowage easement was not created.

¶ 46                    B. Duty to Maintain the Overland Flowage Easement

¶ 47          The dispute over which party is responsible for maintaining the overland flowage easement centers around the term "owner" who, pursuant to the plat, is responsible for the maintenance of the overland flowage easement. The Jeffreys purport that the term "owner" refers to the Association and absolves them from maintenance responsibility. The circuit court disagreed and held that the lot owners had the obligation to maintain their own lots, and that the covenants, supporting this conclusion, permitted the Board's entry should there be an issue with this maintenance.

¶ 48          A developer's declaration, if properly recorded "is valid and binding on the lots to which it pertains." *Board of Managers of Hidden Lake Townhome Owners Ass'n v. Green Trails Improvement Ass'n*, 404 Ill. App. 3d 184, 192 (2010). The rules of contract construction apply to

16

planned unit development declarations and likewise, "[a] covenant is a contract to which the ordinary rules of contract construction apply." *Chicago Title & Trust Co. v. Weiss*, 238 Ill. App. 3d 921, 925 (1992); *Chiurato v. Dayton Estates Dam & Water Co.*, 2017 IL App (3d) 160102, ¶ 28; see *Forest Glen Community Homeowners Ass'n v. Bishof*, 321 Ill. App. 3d 298, 303 (2001) (an interpretation of the covenants contained within a declaration are governed by the rules of construction for contracts).

¶ 49 The primary objective of contract construction is to give effect to the parties' intentions. *Thompson v. Gordon*, 241 Ill. 2d 428, 441 (2011). A court first "look[s] to the language of the contract itself to determine the parties' intent." *Id.* A court reviews the contract as a whole and not in isolated parts when determining the intent of the parties. See *Richard W. McCarthy Trust Dated September 2, 2004 v. Illinois Casualty Co.*, 408 Ill. App. 3d 526, 535 (2011). If the covenants are unambiguous and the parties' intent is facially apparent from the "covenants' explicit provisions, courts should effectuate that intent without relying on extrinsic aids." *Chiurato*, 2017 IL App (3d) 160102, ¶ 28. The interpretation of a contract is a question of law and is subject to *de novo* review. *Richard W. McCarthy Trust Dated September 2, 2004*, 408 Ill. App. 3d at 534-35.

¶ 50 The parties agree that the pertinent portion of the plat to which we should center our focus is entitled "Overland Flowage Easement Provisions" and reads:

> "All easements indicated as overland flowage easements on this plat are reserved for and granted to the township of Green Garden/the County of Will and to their successors and assigns. No buildings shall be placed on said easement, but the same may be used for other purposes that do not adversely affect the free flow of stormwater. *Each owner or subsequent purchaser shall be equally responsible*

17

*for maintaining the overland flowage easement* and shall not destroy or modify grades or slopes without having first received prior written approval of the township of Green Garden/the County of Will, or any other unit of local government having jurisdiction over drainage." (Emphasis added.)

¶ 51    The Jeffreys' position is that, while the term "owner" is not defined in the plat, provisions within the declaration make clear that the Association is the owner of the overland flowage easement. This contention is undermined by the fact that later in the plat, it states if maintenance work was performed by Green Garden, Will County, or "any other unit of local government having jurisdiction over drainage," that entity may place a lien against the "Homeowners Association for Wildgrass Subdivision." The Jeffreys argue that placing a lien against the Association and not against a lot owner's property "clearly evidences the intent of the Developer to make the Association responsible for *** maintenance." Conversely, it seems illogical for the plat to ascribe maintenance responsibility to the Association as the "owner" of the easement but refer to the Association by name later in the same document.

¶ 52    The declaration defines the term "owner," which "shall mean the record Owner, whether one or more persons or entities, of the fee simple title to any Lot which is part of the Development, including the Developer, and including contract sellers, but no [*sic*] including contract purchasers." As the Association and Board point out on appeal, there are various sections within the declaration that refer to "owners" and their obligations. Article VII, section 2 requires that "[e]ach Owner shall, at his sole cost and expense, maintain and repair his residence and Lot," and the following section provides "[e]ach Owner shall be responsible for any damage to public improvements or damage to Common Areas ***." While the owners are referred to as "Lot Owners" in article VII, section 1, this qualifier was used only to distinguish between the

18

developer, the Association, and the Architectural Review Board. After reviewing the declaration in its entirety, there is little doubt that the term "owner" is employed to refer to the subdivision's lot owners consistent with the declaration's definition.

¶ 53　　　Even so, the Jeffreys argue that article IV, section 10 of the declaration, which concerns the ownership transfer of certain areas within the subdivision in the event the Association were to cease operation, evinces the Association's clear ownership interest over the overland flowage easement. That section states:

> "In the event the Association ceases operation, dissolves, or terminates without a successor Homeowner's Association, *then ownership of storm water management facilities*, open space, Common Areas, conservation areas private roadways, or any other area requiring ownership or maintenance *shall be transferred* to a public agency willing to accept the areas, *or shall revert to the Owners of the Lots created by the subdivision*. In such event, Developer, Owners and Association hereby consent to the creation of a Special Service Area by the appropriate governmental entity for the purpose of paying the costs of maintenance as herein provided." (Emphases added.)

¶ 54　　　In their testimonies, the Jeffreys both identified a storm water management facility near their home and asserted that one had not been placed between lots two and three. It appears that this testimony supports their appellate contention that "there is no dispute that the [overland flowage easement] is a stormwater management facility." Accepting their contention as true, their position would nonetheless require us to look beyond the declaration and plat, extrinsically, to tether the easement under the broad definition of "storm water management facilities." The plain language of the plat and the definition of "owner" provided in the declaration are

19

unambiguous and the Jeffreys possess the duty to maintain the easement. Our affirmation of the court's finding that the Jeffreys failed their burden of proving the overland flowage easement was not created and its holding that the Jeffreys bore the obligation to maintain the easement is dispositive, and we need not reach the application of *laches* to this matter.

¶ 55                                                    III. CONCLUSION

¶ 56          The judgment of the circuit court of Will County is affirmed.

¶ 57          Affirmed.

¶ 58          JUSTICE HOLDRIDGE, specially concurring:

¶ 59          I join in the majority's judgment. However, I believe that the case should have been disposed of based on *laches*.